Enrique Olivencia, demandante y apelante, *v.* Tomás Pérez Sales, demandado y apelado.

No. 6866.—*Sometido:* Febrero 6, 1936. *Resuelto:* Mayo 20, 1936.

*Bolívar Pagán*, abogado del apelante; *José Sabater*, abogado del apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Enrique Olivencia invoca la acción judicial para que se le declare hijo natural reconocido de Pedro Pérez Sales, hermano del demandado, con todos los derechos inherentes a su filiación.

Se alega en la demanda que el demandante es hijo natural de Filomena Olivencia y que fué concebido por ésta en amores y actos carnales con Pedro Pérez Sales, quien falleció en Mayagüez el día 6 de julio de 1932; que cuando Filomena Olivencia y Pedro Pérez Sales concibieron y procrearon a Enrique Olivencia eran ambos mayores de edad, solteros y no existía impedimento alguno que les impidiera legalmente contraer matrimonio entre sí; que Enrique Olivencia desde su nacimiento se halló siempre en la posesión continua de estado de hijo natural de Pedro Pérez Sales, quien consideró y trató siempre pública y privadamente al demandante como hijo suyo, prodigándole afectos paternales, teniéndolo bajo su custodia y cuidado y pagándole albergue, ropa, alimentos, medicinas y educación; que Pedro Pérez Sales falleció sin dejar ascendientes ni descendientes, y que su hermano, el demandado Tomás Pérez Sales, es el único pariente dejado a su fallecimiento.

El demandado negó los hechos esenciales de la demanda, alegando que Filomena Olivencia, madre del demandante, contrajo matrimonio con Pedro Leandro Marrero en 30 de agosto de 1893, y que según aparece del Registro Civil de

Mayagüez, Enrique Olivencia nació el día 10 de noviembre de 1897, fecha en que Filomena Olivencia se encontraba casada con el referido Pedro Leandro Marrero.

Con anterioridad a la radicación de esta demanda Enrique Olivencia tramitó en la Corte de Distrito de San Juan una información *ad perpetuam re in memoriam,* alegando que la fecha de su nacimiento ocurrió en 10 de noviembre de 1891 y no en 10 de noviembre de 1897, y solicitando que la corte ordenase la correspondiente corrección en el Registro Civil de Mayagüez. La corte de distrito resolvió esta solicitud de acuerdo con lo solicitado por el peticionario.

La Corte de Distrito de Mayagüez, luego de celebrado juicio y practicada la prueba, declaró sin lugar la demanda por los fundamentos que se expresan a continuación:

"Al presentarse la prueba de la rectificación del nacimiento del demandante el demandado hizo oposición. En nuestro Código de Enjuiciamiento Civil no hay disposición alguna respecto a los expedientes de perpetua memoria, pero en el Código de Enjuiciamiento Civil español que rigió anteriormente en esta isla, en su art. 2001 y siguientes se establece el procedimiento para esta clase de expedientes. En ese expediente de perpetua memoria no intervino el Ministerio Fiscal ni se notificó del mismo al demandado. Si no es aplicable el Código de Enjuiciamiento Civil español, en este caso, las circunstancias en que fué tramitado el expediente *ex parte* demuestra que fué una prueba preparada para este pleito y por lo tanto no tiene valor alguno y debe ser rechazada.

"En tales condiciones el demandante nació cuando su madre Filomena Olivencia estaba casada legalmente con Pedro Leandro Marrero, de quien nunca se divorció y es un hijo legítimo no pudiendo ser declarado hijo natural reconocido del causante del demandado."

Convenimos en que la información *ad perpetuam re in memoriam* no tiene valor probatorio alguno cuando no se tramita con las formalidades exigidas por la ley. Si se cumplen estas solemnidades, sirve para justificar los hechos a que se refiere, salvo prueba en contrario y cuando no se

trate de hechos de que pueda resultar perjuicio a una persona cierta y determinada.

Manresa, comentando la fuerza y valor probatorios de estas informaciones, se expresa así:

"Aunque la ley no lo dice en este lugar, lo declaró ya en el artículo 596. 'Bajo la denominación de documentos públicos y solemnes, dice dicho artículo, se comprenden . . . *las actuaciones judiciales de toda especie.*' Las informaciones de que tratamos son actuaciones judiciales; luego tendrán en juicio la fuerza y valor de documentos públicos y solemnes, para justificar los hechos a que se refieran, salva siempre la prueba en contrario. Mas, para que tengan esta fuerza probatoria, es indispensable que estén practicadas con las formalidades prevenidas en los artículos 2003 y siguientes, y que, como ordena el 2002, no se refieren a hechos de que pueda resultar perjuicio a una persona cierta y determinada; careciendo de estos requisitos no podrán surtir efecto alguno probatorio, como lo declaró el Tribunal Supremo de Justicia en sentencia de 27 de junio de 1864." 6 Manresa, Ley de Enjuiciamiento Civil, 426 (3ª. Ed., pág. 443).

Si ésta hubiese sido la única prueba presentada, indiscutiblemente que tendríamos que confirmar el fallo de la corte inferior, declarando sin lugar la demanda; pero el demandante ofreció además prueba testifical para demostrar que en la fecha de su nacimiento su madre, Filomena Olivencia, era soltera, que es hijo de Pedro Pérez Sales, y que gozó de la posesión de estado de hijo natural del mismo.

En 19 de diciembre de 1910, años después del nacimiento de Enrique y veinte años antes de haberse iniciado esta acción, Filomena Olivencia inscribió en el Registro Civil de Mayagüez el nacimiento de su hijo Enrique. De la certificación, expedida por el Secretario del Registro Civil, copiamos lo siguiente:

"En la ciudad de Mayagüez, a las diez de la mañana del día diez y nueve de diciembre del año mil novecientos diez, ante Don Rafael Mangual Delgado, Secretario Municipal, compareció Filomena Olivencia, natural de Mayagüez, mayor de edad, estado soltera, profesión costurera, calle de _____ y domiciliada en el barrio de Mayagüez Arriba, declarando en este acto el nacimiento de un niño

cuyo alumbramiento tuvo lugar en la casa de la declarante el día diez del mes de noviembre de 1897 y a las doce de la noche, siendo hijo natural de la declarante. Nieto por la línea materna de Cristina Olivencia. Y que a dicho niño se le pone el nombre de ENRIQUE."

Como se ve, la madre del demandante aparece declarando que era soltera en la fecha en que se llevó a cabo la inscripción. Para esa fecha la referida señora estaba casada con Pedro Leandro Marrero. Es raro que Filomena Olivencia hiciese constar que era soltera en la fecha en que inscribió el nacimiento de su hijo y no en la fecha en que ocurrió el nacimiento, para poder inscribirlo como hijo natural. ¿Qué interés pudo tener esta señora en faltar a la verdad? ¿Puede concebirse que tratara de inscribir como natural a un hijo legítimo? ¿Por qué, si era legítimo, su esposo Pedro Marrero no lo inscribió oportunamente? Puede que Filomena Olivencia sufriese una equivocación respecto a la fecha del nacimiento de su hijo al hacer la inscripción y puede también que no hubiese sido entendida por el encargado del Registro Civil. En su testimonio, declarando a preguntas del abogado del demandado, la madre del demandante dice que cuando inscribió a su hijo era casada, pero que lo tuvo cuando era soltera. De la transcripción de evidencia copiamos lo siguiente:

"P. ¿Usted fué a inscribir a ese hijo Enrique?
R. Sí, señor.
P. ¿Dónde fué que lo inscribió?
R. En el Registro Civil de Mayagüez.
P. ¿Cuando Ud. lo inscribió, Ud. dijo que era soltera?
R. No, cuando yo lo inscribí ya era casada, pero el niño lo tuve cuando soltera.
P. ¿Cuándo fué que Ud. se casó?
R. En el año 1893.
P. ¿Se casó Ud. por la Iglesia Católica?
R. Sí, señor.
P. ¿Y nunca se divorció?
R. Nunca, hasta la muerte de Pedro Leandro Marrero.
P. ¿Ud. sabe cuándo él falleció?
R. Harán como dos años, pero no sé la fecha."

También según el registro Filomena declaró que su hijo nació en 10 de noviembre de 1897. Esta inscripción, como ya hemos dicho, se llevó a cabo veinte años antes de iniciarse este pleito, en una fecha tan lejana que no es posible que la madre del demandante estuviese preparándose para una acción de filiación contra Pedro Pérez Sales. Del hecho de que una madre cumpla, aunque sea tardíamente, con el deber de inscribir el nacimiento de un hijo natural no puede deducirse la intención de prepararse para un pleito en el futuro contra un padre que no se menciona y que no resulta afectado por el acto de la madre inscribiendo y reconociendo como suyo al hijo natural.

Filomena Olivencia declaró que Pedro Pérez Sales fué su primer marido; que se conocieron siendo muchachos y que ambos vivían muy cerca en el barrio de Bateyes; que Pedro Pérez Sales estuvo enamorándola como un año y que tuvo un hijo que se llama Enrique Olivencia; que vivió con él en su propia casa, con el consentimiento de su mamá; que vivieron como marido y mujer y que él iba a su casa y le llevaba el diario todas las semanas; que él iba de noche y mientras el niño estuvo en su casa todos los días; que recuerda que Pedro Pérez Sales le regaló un aro durante ese año de relaciones donde estaban grabados el nombre de Pedro, su apellido y el año; que como al año de tener al niño Pedro Pérez Sales se lo llevó a la abuelita diciéndole que se iba a quedar con él porque la abuelita lo quería muchísimo; que la declarante se casó a los dos años con Pedro Marrero, de quien tuvo dos hijos; que todos los gastos de su hijo Enrique Olivencia los sufragó su padre, Pedro Pérez Sales, quien se encargó de la manutención de Enrique; que Pedro Pérez Sales le suministraba la ropa y el alimento del niño y que se lo daba todo; que le parece que vivió con Pedro Marrero como diez años; que le parece, porque le fallan las fechas; que durante el tiempo que estuvo casada con Pedro Marrero los gastos de Enrique Olivencia los pagaba Pedro Pérez Sales; que inscribió a Enrique en el Registro Civil

de Mayagüez; que lo inscribió cuando ella estaba casada; pero que lo tuvo cuando estaba soltera; que se casó en 1893.

La testigo Francisca Laguerra declara que actuó como comadrona en el nacimiento del demandante; que Pedro Pérez Sales la fué a buscar para que le prestara sus servicios a Filomena Olivencia en el nacimiento de Enrique; que prestó esos servicios; que estuvo presente hasta el nacimiento de Enrique Olivencia; que Pedro Pérez Sales le pagó por los referidos servicios; que Pedro Pérez Sales siempre estaba en la casa pendiente de que llegara la declarante para que atendiera al niño; que asistió a Filomena Olivencia durante los nueve días que le pertenecían; que tenía como veinticinco años de edad para esa fecha; que Filomena Olivencia vivía en su casa, con su mamá, y que para ese tiempo era joven y señorita; que se casó como a los dos años de tener el niño; que no se acuerda del nombre de la persona con quien se casó; que como al año de nacer el niño se fué para Las Marías y que por tal motivo no sabe si el marido de Filomena Olivencia está vivo o muerto ahora; que después que se fué para Las Marías volvió a ver a Enrique Olivencia como a los ocho años.

Luis Vázquez Brugman, de setenta y siete años de edad, declara que vivió con Pedro Pérez Sales como veinte o veintidós años en una casita al lado de su casa de vivienda; que Enrique Olivencia tenía como de diez a doce años después de la invasión americana y del temporal de San Ciriaco y que Pedro Marrero se casó con Filomena Olivencia después de nacido Enrique.

Fueron varios los testigos que declararon, de parte del demandante, para probar las alegaciones de la demanda; pero los únicos que dicen categóricamente que cuando Enrique Olivencia nació, su madre, Filomena, permanecía en estado de soltería, son los tres que acabamos de citar. De parte del demandado declararon también varios testigos sobre este particular.

Gregoria Marrero, hermana de Pedro Marrero, declara que vive en Bateyes, al cuidado del demandado Tomás Pérez Sales, que sabe que Enrique Olivencia nació en el barrio de Bateyes, en casa de la abuela y que cuando ocurrió su nacimiento ya estaba casada Filomena con Pedro Marrero. Con respecto al testimonio de esta testigo, copiamos lo que sigue de la transcripción de evidencia:

"¿P. Ud. conoció a Pedro Marrero?

R. ¡Cómo no lo voy a conocer!

P. ¿Por qué Ud. lo conoce?

R. Porque era hermano mío.

P. ¿Pedro Marrero es vivo o muerto?

R. Muerto.

P. ¿Cuándo murió él?

R. Yo no recuerdo la fecha; creo que hace dos años.

P. ¿Cuando murió Pedro Marrero, él era soltero, casado o viudo?

R. Casado.

P. Con quién estaba casado él?

R. Con Filomena Olivencia.

P. ¿Ud. conoce a Enrique Olivencia?

R. ¡Cómo no lo voy a conocer!

P. ¿Qué es de Ud. Enrique Olivencia?

R. Para mí puede ser una chispita de sangre por la madre; por el padre no."

Véase como Gregoria Marrero, cuando se le pregunta qué es de Enrique Olivencia, contesta que puede ser una chispita de sangre por la madre, pero por el padre no. Es decir, por su hermano Pedro Marrero, la testigo no tiene perentesco alguno con el demandante. Puede tenerlo, "aunque sea una chispita de sangre", con Filomena Olivencia. Esta contestación, producida inocentemente por una persona que vive al cuidado del demandado, y que es hermana de Pedro Marrero, parece indicar dónde es que está la verdad.

El testigo Gregorio Olivencia declara que cuando nació Enrique, Filomena estaba casada con Pedro Marrero. Este testigo fué sometido a un fuerte interrogatorio por la parte demandante, con el propósito de demostrar su interés. Su

testimonio no trae a nuestro ánimo la impresión de que esté diciendo la verdad.

Pedro Desjardín también declara que Filomena Olivencia estaba casada con Pedro Marrero cuando nació el demandante. Este testigo vive en casa de Tomás Pérez.

Esta es toda la prueba producida por la parte demandada para demostrar que Pedro Marrero y Filomena Olivencia habían contraído matrimonio cuando surgió a la vida el demandante. Frente a este testimonio tenemos la declaración de la propia madre, que relata detalladamente sus relaciones con Pedro Pérez Sales, la concepción del niño y su nacimiento antes de haber contraído matrimonio con Pedro Marrero. La comadrona, quien dice tener como noventa años más o menos, declara con claridad y lucidez, sin incurrir en contradicciones y aparentemente sin vacilar, ante el contrainterrogatorio de la parte demandada. El testimonio de esta testigo es claro y terminante. Pedro Pérez la fué a buscar para que prestara sus servicios a Filomena Olivencia cuando nació el demandante; Pedro Pérez estuvo presente en aquellos instantes y pagó los servicios prestados por la testigo; Pedro Pérez estaba siempre en la casa pendiente de que llegara la comadrona para que asistiera al niño.

En cuanto a la posesión de estado de hijo natural, además del testimonio de Filomena Olivencia y Francisca Laguerra, que ya conocemos, se produjo la prueba que pasamos a relatar.

Juan Arroyo Mestre declara que tiene sesenta y cinco años de edad; que es vecino de Mayagüez y que vive allí desde su nacimiento; que conoció a Pedro Pérez Sales desde 1908; que Pedro Pérez Sales tenía mucha confianza con él y que él le arregló una documentación para tomar un préstamo en el Banco Federal; que él era consejero de Pedro Pérez Sales; que iba a la casa de Pedro Pérez Sales y allí conoció a Enrique Olivencia; pero allí le decían Enrique Pérez; que conoció a Enrique Olivencia viviendo en la casa del padre y viniendo en el cochecito de él a Mayagüez; y

que el padre le daba dinero para comer y para fiestar y le decía su hijo; que Enrique Olivencia se dirigía a Pedro Pérez Sales diciéndole "papá"; y que Pedro Pérez Sales le llamaba hijo; que veía a Pedro Pérez Sales todas las semanas; que iba a su finca a menudo; que observaba que entre Pedro Pérez Sales y Enrique Olivencia existía armonía; que él le daba ropa, alimento y todo; que lo trataba como hijo; que Pedro Pérez Sales llevaba a Enrique Olivencia a la casa del declarante y se le daba comida; que Pedro Pérez Sales le daba dinero para el hijo; que las relaciones eran cordiales; que todo el mundo decía que Enrique Olivencia era hijo de Pedro Pérez Sales, todo el barrio; que le habló a Pedro Pérez Sales muchas veces en relación con el reconocimiento de Enrique Olivencia; que él le preguntó en qué forma podía reconocer un hijo y le dijo que por medio de un testamento; que se refería a Enrique Olivencia; que no ha conocido otro; que no conoce a la madre de nombre, solamente de vista; que sabe que la madre es casada, pero no conoce al marido; que no se hizo el testamento al cual el declarante hizo referencia.

Lope Valdespino ·declara que tiene como 45 ó 46 años; que ha vivido toda su vida en Mayagüez; que conoce a Enrique Olivencia; que lo conoce desde niño; que conoció a Pedro Pérez Sales desde que tuvo uso de razón; que él vivía en el barrio Bateyes al igual que el declarante; que siempre fueron amigos, iban a fiestas; que el declarante iba a la casa de Pedro Pérez Sales y éste iba a la del declarante; que los padres del declarante eran amigos de Pedro Pérez Sales; que le lleva como cuatro o cinco años a Enrique Olivencia; que lo conoció viviendo, cuando chiquito, con la mamá, como de 4 ó 6 años; que después de esto vivía con el papá, con Pedro Pérez Sales; que vió a Enrique Olivencia y Pedro Pérez Sales con mucha frecuencia; que Pedro Pérez Sales trataba a Enrique Olivencia como hijo; que Enrique Olivencia le decía "papá"; que Pedro Pérez Sales siempre andaba con Enrique Olivencia; que él veía que el muchacho

obedecía al padre; que el trato que le daba era de un padre para un hijo; que sabe que Enrique Olivencia es sobrino de Tomás Pérez Sales, quien nunca lo ha negado y quien ha aceptado que Enrique Olivencia es su sobrino; que conoció a Enrique Olivencia cuando tenía cuatro años, porque vivía al frente, con la abuela, "para la guerra, entonces con el tío, con Tomás, en mi propia casa"; que Enrique Olivencia estaba en el Norte para la muerte de Pedro Pérez Sales; que conoció mucho a la madre de Enrique Olivencia; que hoy es viuda de Pedro Marrero; que hará poco que murió Pedro Marrero; que no recuerda cuándo nació Enrique Olivencia; que lo vino a conocer de ocho o nueve años; que le conoce tres hijos a Filomena Olivencia; que los otros dos hijos son menores que Enrique Olivencia.

Luis Ramírez declara que tiene sesenta años; que estuvo conociendo a Pedro Pérez Sales en el barrio Bateyes como cinco o seis años; que para esa época conoció a Enrique Olivencia y que tendría una edad de tres o cuatro años; que conoce a Filomena Olivencia, que es madre de Enrique Olivencia; que él iba a menudo con Pedro Pérez Sales a casa de la madre de Enrique Olivencia, y que Pedro Pérez Sales lo llamaba como hijo y que lo llevaba para allá y para acá; que le daba un trato como hijo; que estuvo viviendo en ese barrio como cuatro o cinco años; que Enrique Olivencia vivía con su madre para esa época; que como cada quince días tropezaba con Pedro Pérez Sales y se lo encontraba con el niño; que habló con él y le dijo: "¿Y ese chiquito?" y Pedro Pérez Sales le dijo: "Es mío"; que Pedro Pérez Sales vivía en la casa con Filomena Olivencia.

Carmen López declara que es vecina de Mayagüez, y que ha vivido casi toda su vida allí; que conoció a Pedro Pérez Sales, allá para el año 1909 ó 1910; que ella llevó relaciones con él y que él se la llevó para su casa; que vivía como su mujer, como su querida; que vivió con él como tres años; que lo veía siempre porque vivía en la misma casa; que vivió con él como un año y después él le compró una casa

en el barrio Colombia y él iba allá; que conoce a Enrique Olivencia; que cuando Pedro Pérez Sales la llevó a la finca estaba Enrique Pérez, que todo el mundo lo conocía como Enrique Pérez; que Pedro Pérez Sales trataba a Enrique Olivencia como hijo; y que Enrique Olivencia lo trataba como padre, lo trataba muy bien; que estuvo observando esto durante el tiempo que vivió allí.

Ramón Rodríguez declara que tiene casi sesenta años de edad; que se crió en casa de Pedro Pérez Sales, en el barrio Bateyes, de Mayagüez; que vivió en casa de Pedro Pérez Sales desde chiquito; que vivió como familiar de él; que conoció a Enrique Olivencia cuando muy pequeño en casa de Pedro Pérez Sales; que Enrique Olivencia vivía con Pedro Pérez Sales desde muy pequeño; que el trato entre Pedro Pérez Sales y Enrique Olivencia era de hijo y padre y padre e hijo; que Enrique Olivencia se dirigía a Pedro Pérez Sales diciéndole "papá" y que este último le respondía como padre; que estuvo observando este trato hasta que se salió de la casa y se vino para Mayagüez y que hace como 10 ó 12 años de eso; que Pedro Pérez Sales le dijo que Enrique Olivencia era hijo de él; que conoce a la mamá de Enrique Olivencia desde muy pequeña; que ella tuvo otros hijos después de Enrique Olivencia; que Enrique Olivencia vivía con Pedro Pérez Sales cuando la invasión americana.

Luis Vázquez Brugman declara que tiene 77 años; que conoció a Pedro Pérez Sales y que vivió con él 20 ó 22 años en una casita al lado de la casa de vivienda de él; que le trabajaba a Pedro Pérez Sales en un aserrador; que conoce a Enrique Olivencia, conocido por Enrique Pérez, porque éste estaba en la casa; que cuando se iba el muchacho para la escuela le pedía la bendición al padre Pedro Pérez Sales; que Pedro Pérez Sales trataba a Enrique Olivencia como hijo; que Pedro Pérez Sales le encargaba a Enrique Olivencia que tuviera mucho cuidado con los otros muchachos en la escuela; que el tratamiento que le daba don Pedro Pérez Sales a Enrique Olivencia era como el de un padre a un hijo; que

después, cuando el niño aprendió un poco, muchas veces don Pedrito estaba enfermo y no podía ir a apuntar el café y mandaba al muchacho a hacerlo; que Pedro Marrero se casó con Filomena después que había nacido Enrique; que se casó para el 1890 ó 1891; que no tiene conocimiento de que Filomena tuviera otros hijos.

Enrique Olivencia declara que tiene más o menos 41 a 42 años; que Pedro Pérez Sales era su padre; que tiene recuerdo de su padre desde que tuvo uso de razón; que vivió con su padre y su abuelita desde que tuvo uso de razón en el barrio Bateyes, de Mayagüez; que Pedro Pérez Sales lo tenía a él en concepto de hijo; que cuando lo llamaba le decía "papá"; que le atendía para los gastos de su ropa, calzado, alimentos y medicinas; que lo mandó a la escuela de "Naranjales"; que Pedro Pérez Sales lo llevaba a Mayagüez en su coche; que lo tenía como hijo y que llevaba al declarante por dondequiera; que estuvo viviendo con Pedro Pérez Sales hasta el 1914; que un día estaba sin trabajo y lo llamó y le dijo que estaba en malas condiciones, que le pidió $75 para un pasaje para embarcarse y que su padre se los dió; que mientras estuvo en los Estados Unidos le escribió dos cartas; que estuvo en los Estados Unidos como once años; que regresó de los Estados Unidos como un mes después que murió su padre; que supo que había muerto en casa del Sr. Tomás Pérez Sales; que éste lo trataba como sobrino; que el declarante fué a la casa de él y que éste lo despidió y le regaló $10; que hasta la fecha que vivió con Pedro Pérez Sales ninguna otra persona le suplió los gastos de comida, ropa y demás; que no puede decir que su padre le contestara las cartas cuando el declarante se encontraba en los Estados Unidos.

De parte del demandado declaró Gregorio Olivencia que se pasaban meses sin que él viera a Pedro Pérez Sales y que nunca vió a Enrique Olivencia andando con Pedro Pérez Sales.

Gregoria Marrero, hermana de Pedro Marrero, declaró, como ya hemos dicho, que podía tener una chispita de san-

gre con Enrique Olivencia por la madre, pero no por el padre.

Pedro Desjardín declaró que Enrique Olivencia vivió con Filomena Olivencia hasta que se fué para los Estados Unidos; que nunca lo vió con Pedro Pérez Sales.

El demandado presentó también como prueba los siguientes documentos: Una certificación de nacimiento de Enrique Olivencia, que ya hemos estudiado y discutido, una resolución de la Corte de Distrito de Mayagüez recaída en un expediente para elevar a escritura pública cierto testamento de palabra otorgado por Pedro Pérez Sales, donde se hace constar que éste falleció sin dejar ascendientes ni descendientes legítimos ni naturales, y dos acusaciones presentadas por el Pueblo de Puerto Rico contra el demandante, una por alterar la paz pública y otra por acometimiento y agresión con circunstancias agravantes, con las sentencias condenatorias de ambas.

En la primera acusación, formulada en 11 de noviembre de 1915, se alega que Enrique Marrero perturbó la paz y tranquilidad de Pedro Pérez, tirando piedras sobre el balcón de la casa del Pérez, con intención criminal de amedrentarle e intranquilizarle. El acusado hizo constar que se llamaba Enrique Pérez y se ordenó la sustitución del nombre, dictándose sentencia contra Enrique Pérez. La segunda acusación se formuló en 18 de noviembre de 1915 contra Enrique Marrero, conocido por Enrique Pérez, por haber agredido con una piedra a Ramona Vargas. Alega el demandado que la primera acusación se presentó contra Enrique Marrero, quien dijo entonces que se llamaba Enrique Pérez, por perturbar la paz de Pedro Pérez, de quien reclama precisamente su paternidad. Aunque este Pedro Pérez que se menciona en la acusación sea el propio padre del demandante, y aun cuando resulte condenable el proceder del hijo, es significativo que para aquella fecha, muchos años antes de promoverse esta acción, el demandante alegase que se llamaba Enrique Pérez. La segunda acusación se formuló también contra Enrique Marrero, conocido por Enrique Pérez. Véase como la

misma prueba del demandado demuestra que Enrique Marrero era conocido por Enrique Pérez, corroborando en este respecto la prueba del demandante.

Hemos examinado detenidamente la prueba practicada. A nuestro juicio se ha demostrado satisfactoriamente que el demandante es·hijo de Pedro Pérez Sales y que gozó de la posesión de estado de hijo natural. La prueba robusta ofrecida en apoyo de la alegada filiación no ha sido destruída por la que ha producido el demandado, parte de la cual, como ya hemos dicho, puede asegurarse que tiende a corroborar la del demandante. Así lo demuestra el testimonio de Gregoria Marrero, hermana de Pedro Marrero, y las dos causas criminales donde se hace constar que el demandante era conocido con el nombre de Enrique Pérez. El propio demandado, Tomás Pérez Sales, hermano de Pedro Pérez Sales, que estuvo presente durante el juicio, se abstuvo de declarar, a pesar de que fué aludido directamente por el testigo Lope Valdespino, y por el demandante Enrique Olivencia. Como hemos visto, el primero declaró que sabe que Enrique Olivencia es sobrino de Tomás Pérez Sales, quien nunca lo ha negado y quien ha aceptado que Enrique Olivencia es su sobrino. A preguntas del demandado respondió que conoció a Enrique Olivencia cuando tenía cuatro años, porque vivía al frente, con la abuela, "para la guerra, entonces con el tío, con Tomás, en su propia casa", en la propia casa del declarante.

El demandante dice que se enteró de la muerte de su padre en casa de Tomás Pérez Sales, quien lo trataba como sobrino; que el declarante fué a su casa y que el demandado le regaló $10.00.

Consideramos probadas las alegaciones de la demanda y por lo tanto entendemos que debe revocarse la sentencia apelada y dictarse otra en su lugar declarando al demandante Enrique Olivencia hijo natural reconocido de Pedro Pérez

Sales, con todos los derechos inherentes a su filiación, sin especial condenación de costas.

El Juez Asociado señor Wolf disintió.*

El Juez Asociado señor Travieso no intervino.