VÍCTOR JOSÉ MIRANDA, demandante y apelante, *v.* VÍCTOR JOSÉ COSTA, demandado y apelado.

Número 10744.

*Sometido:* 26 de enero de 1953. *Resuelto:* 30 de diciembre de 1954.

*Gustavo Cruzado Silva,* abogado del apelante; *McConnell & Valdés,* abogados del apelado.

SENTENCIA

Se confirma la sentencia apelada dictada por la anterior Corte de Distrito de San Juan, con fecha 18 de diciembre de 1950, en el caso de epígrafe.

Así lo pronunció y manda el Tribunal y firma el Sr. Juez Presidente. El Juez Asociado Sr. Negrón Fernández disiente por los fundamentos expuestos en sus opiniones rendidas en los casos de *Vargas* v. *Jusino*, 71 D.P.R. 389, 396, *Figueroa* v. *Díaz*, 75 D.P.R. 163 y *Armaiz* v. *Santamaría*, caso civil número 10,945, *per curiam* resuelto el 30 de diciembre de 1953, [75 D.P.R. 579].

El Juez Asociado Sr. Pérez Pimentel no intervino.

El Juez Asociado Sr. Belaval disintió en opinión separada.

A. CECIL SNYDER,
*Juez Presidente,*

Certifico:

IGNACIO RIVERA,
*Secretario.*

Opinión disidente del Juez Asociado Sr. Belaval.

Se trata de una acción de filiación bajo la Ley núm. 229 de 12 de mayo de 1942 ((2) pág. 1297), según quedó enmendada por la Ley núm. 243 de 12 de mayo de 1945 (pág. 815), donde el demandante-apelante alega que de ciertas relaciones sexuales habidas entre su madre doña Obdulia Miranda y su alegado padre don Víctor José Costa, nació el demandante–apelante el día 4 de marzo de 1932; que aunque su alegado padre no lo ha reconocido en forma legal, lo ha hecho en "virtud de actos que constituyen prueba auténtica de su paternidad". Por haber sido el alegado padre un hombre casado, cuando mantuvo las alegadas relaciones extra-matrimoniales de las cuales se alega nació el demandante–apelante, la súplica es al efecto que se le declare hijo natural reconocido de su alegado padre, para el único fin de poder usar el apellido de éste.

La prueba que tuvo ante sí la ilustrada Sala sentenciadora podría resumirse de la siguiente manera: desde el mes

de junio de 1931 hasta el mes de octubre del mismo año, la madre del demandante–apelante tuvo relaciones sexuales con el demandado-apelado, casi diariamente, en una casa que dicho demandado-apelado instaló para ella en la calle Del Río, del barrio de Santurce; que en el mes de octubre de 1931, al informarle ella que estaba encinta de él, el demandado-apelado la requirió para que "se sacara el muchacho", a lo cual ella se negó; que después de dicha negativa el demandado-apelado no volvió donde ella, interrumpiendo sus relaciones extra-matrimoniales con la madre; que en una ocasión, cuando el niño tenía cuatro años de edad, se enfermó y ella le pidió ayuda por teléfono al demandado, enviándole éste cinco dólares, pero antes le dijo que no lo tomara como una obligación; que cuando el hijo se iba a graduar de escuela superior, la madre le encomendó al señor Samuel Castro Ponce que llevara al hijo de ella a presencia de su alegado padre, para que éste lo reconociera; que el señor Samuel Castro Ponce llevó el hijo a presencia de su alegado padre y cumplió con la encomienda de pedirle el reconocimiento; que el demandado-apelado le contestó en tono sarcástico, que él se encontraba enfermo, que iba a durar muy poco y que eso del reconocimiento estaba en manos de su abogado; que el demandado-apelado en esa ocasión, miró con indiferencia al demandante y no le hizo caso, cosa que sintió mucho dicho menor.

Habiendo manifestado el ilustrado juez sentenciador dudas sobre la suficiencia de la evidencia presentada por el demandante-apelante, de acuerdo con la doctrina prevaleciente a la fecha de la vista del caso, el demandado-apelado no tuvo que presentar su prueba. Después de analizar la evidencia presentada por el actor, el ilustrado juez sentenciador dictó sentencia declarando que la prueba no era suficiente para que la acción del demandante-apelante pudiera considerarse comprendida entre los casos previstos por el art. 125 del Código Civil de Puerto Rico, y por lo tanto, no podía concedérsele el estado de hijo natural del demandado al efecto de llevar el apellido de su padre.

Los fundamentos de la sentencia fueron expuestos de la siguiente manera: la acción se ejercita bajo las disposiciones de la Ley núm. 229 de 12 de mayo de 1942, según quedó enmendada por la Ley núm. 243 de 12 de mayo de 1945, especialmente su sec. 2. Como la ley no especifica los casos en que un hijo adulterino, incluído en virtud de la enmienda entre los hijos naturales, nacido con anterioridad al 12 de mayo de 1942 puede ejercitar su acción de reconocimiento, se ha resuelto por el Tribunal Supremo de Puerto Rico que podrá ejercitar dicha acción siempre que logre probar su estado filial de acuerdo con las disposiciones del art. 125 del Código Civil de Puerto Rico, referente a los hijos naturales, cuyo inciso 4 establece que el padre está obligado a reconocer al hijo "cuando el hijo pueda presentar cualquier *prueba auténtica* de su paternidad." Si bien el Código Civil de Puerto Rico no dice qué clase de prueba es la que se considerará como "prueba auténtica", el Tribunal Supremo de Puerto Rico ha resuelto, que esa prueba debe ser tal "que pueda equipararse a la determinada por un escrito indubitado de expreso reconocimiento, por la posesión continua del estado de hijo natural y por el concubinato de la madre con el padre durante el embarazo o al tiempo del nacimiento del hijo. Analizada la prueba presentada, la misma no es suficiente para establecer un estado de concubinato-matrimonio sin serlo; tampoco revela que el demandante se encontrara en posesión continua del estado de hijo natural, y parece concluirse además, aunque no se dice expresamente en las conclusiones del fallo, que la prueba no es suficiente para probar la paternidad del hijo adulterino.

No conforme con las declaraciones legales del fallo pronunciado en su contra, el demandante-apelante apeló ante este Tribunal, y señala como único error, el siguiente: "erró el tribunal inferior al resolver que al amparo del párrafo segundo de la sec. 2 de la Ley núm. 229 de mayo 12 de 1942, según quedó enmendada por la Ley núm. 243 de mayo 12 de 1945, el demandante no estableció su caso a la luz del inciso 4

del art. 125 del Código Civil y al resolver que la prueba del demandante no era ni siquiera prima facie para establecer su acción."

En el 1902, en virtud del art. 189 del Código Civil Revisado en vigor en dicha fecha, el padre estaba obligado a reconocer al hijo ilegítimo: "1–Cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad; 2–cuando pública o privadamente lo tenga por hijo suyo o le haya llamado tal en conversación o se ocupe de su educación o sostenimiento; 3–cuando la madre fué conocida viviendo en concubinato con el padre al tiempo del embarazo o nacimiento del hijo o cuando éste haya nacido llevando sus padres relaciones amorosas."

Si se estudia con algún detenimiento la estructura de este artículo, no es difícil encontrar en él, una mal compensada y peor sistematizada combinación del art. 135 del Código Civil Español del 1889 que establecía: "el padre está obligado a reconocer al hijo natural: cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad" (o) "cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos directos del mismo padre o de su familia" y de los arts. 208 y 209 del Código Civil de Louisiana del 1825, que dicen: "los hijos ilegítimos, que no hayan sido legalmente reconocidos, se les permitirá probar su descendencia paterna" (*paternal descent*) (art. 208); "en el caso en que la prueba de la descendencia paterna queda autorizada por el artículo precedente, la misma puede demostrarse de las siguientes maneras: (1) por toda clase de documentos privados en los cuales el padre haya reconocido a su bastardo como hijo propio o lo haya designado como tal; (2) cuando el padre, bien pública o privadamente lo haya reconocido como su hijo, o lo haya así nombrado como tal en una conversación o lo haya educado como tal hijo; (3) cuando la madre del niño fuera conocida viviendo en concubinato con el padre en la casa de dicho padre al tiempo de la concepción del hijo." (art. 209).—Vide:

Código Civil Español relacionado con las Leyes Vigentes y anotado por Dionisio Doblado, (ed. de la Librería de la Viuda de Hernando & Compañía) (1889) y *Revised Civil Code of Louisiana with amendments including the Session of the Legislature of 1908.*—E.D. Saunders, (ed. de F. F. Hansell & Brother Ltd.) (1909).

Menos el primer inciso "cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad", de origen español, el resto de los incisos son tomados del Código Civil de Louisiana, con excepción de la última disposición que autoriza el reconocimiento cuando el hijo haya nacido "llevando sus padres relaciones amorosas", que parece haber sido la contribución netamente puertorriqueña a la confección de dicho art. 189.

Como se ve, en el 1902, cuando estaba en vigor el art. 189, génesis de nuestro actual art. 125, había en Puerto Rico para los hijos ilegítimos, todavía definidos como "los nacidos fuera de matrimonio", las siguientes probabilidades de reconocimiento: (1) el escrito indubitado, (2) cuando pública o privadamente el padre tuviera al hijo como tal; (3) cuando así lo hubiera llamado durante una conversación; (4) cuando el padre se ocupare de la educación y sostenimiento del hijo; (5) cuando la madre fuera conocida viviendo en concubinato con el padre al tiempo del embarazo; (6) cuando la madre fuera conocida viviendo en concubinato con el padre al tiempo del nacimiento; (7) cuando el hijo naciera llevando sus padres relaciones amorosas.

La historia legislativa de la reforma que sufre el articulado de nuestro Código Civil, en todo lo referente a hijos naturales, es curiosa. El Proyecto de la Cámara de Delegados núm. 209, que es el que finalmente se convierte en la Ley núm. 73 de 9 de marzo de 1911 (pág. 247), y en parte, en el art. núm. 193 de la ed. de 1911 de nuestro Código, que pasa a ser el art. 125 de la ed. de 1930, todavía en vigor, originalmente se presentó en la Cámara de Delegados en la siguiente forma:

"Art. 193—Son hijos naturales los nacidos, fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella.

"El hijo natural puede ser reconocido por el padre o la madre conjuntamente, o por uno solo de ellos, en el acta de nacimiento, en testamento o en otro documento público.

"El padre está obligado a reconocer al hijo natural: (1) cuando existe escrito suyo indubitado en que expresamente reconozca su paternidad, (2) cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia.

"La madre estará obligada al reconocimiento del hijo natural, en los mismos casos que el padre, y además cuando se pruebe cumplidamente el hecho del parto o la identidad del hijo.

*"Cuando el padre o la madre hiciere el reconocimiento separadamente, no podrá revelar el nombre de la persona con quien hubiere tenido el hijo, ni expresar ninguna circunstancia por donde pueda ser conocida.*

"El hijo mayor de edad no podrá ser reconocido sin su consentimiento.

"Cuando el reconocimiento del menor de edad no se realiza en el acta del nacimiento o en testamento, será necesaria la aprobación del Juez de la Corte de Distrito en que resida el menor, con intervención del fiscal."

Como se ve, la intención de nuestra Cámara de Delegados fué reincorporar a nuestras instituciones civiles casi literalmente, las disposiciones de los arts. 119, 129, 131, 135, 136, 132 y 133, del Código Civil español del 1889. Hemos presentado la concordancia de los artículos en el orden que fueron incorporados en el proyecto núm. 209.

Aprobado dicho proyecto por la Cámara de Delegados de Puerto Rico fué remitido al Consejo Ejecutivo de Puerto Rico, que en aquella fecha cumplía funciones parecidas al de un senado, para su aprobación. El Consejo Ejecutivo lo devolvió enmendado en la siguiente forma:

"Art. 193.—Son hijos naturales los nacidos, fuera de matrimonio, de padres que al tiempo de la concepción de aquellos, hubieran podido casarse sin dispensa o con ella.

"El hijo natural puede ser reconocido por el padre o la madre conjuntamente, o por uno solo de ellos, en el acta de nacimiento, en testamento, o en otro documento público.

"El padre está obligado a reconocer al hijo natural:

"1—cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad.

"2—Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificado por actos del mismo padre o de su familia.

"3—Cuando la madre fué conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo *así como cuando la madre, habiendo tenido otros hijos del padre, hubiere sido abandonada por el padre mientras estaba embarazada del hijo que trata de ser reconocido.*

"4—Cuando el hijo pueda presentar cualquier prueba auténtica *de su condición de hijo natural.*

"La madre estará obligada al reconocimiento del hijo natural, en los mismos casos que el padre, y además cuando se pruebe cumplidamente el hecho del parto y la identidad del hijo.

"El hijo mayor de edad no podrá ser reconocido sin su consentimiento.

"Cuando el reconocimiento del menor de edad no se realiza en el acta de nacimiento o en el testamento, será necesaria la aprobación del Juez de la Corte de Distrito en que resida el menor con intervención del fiscal."

Como se ve el Consejo Ejecutivo no estuvo conforme con la total reversión a la teoría española sobre la naturalidad, ni con la prohibición de investigar la paternidad o la maternidad cuando una sola de las dos partes hacía el reconocimiento, que contenía el proyecto original presentado por el delegado señor José de Diego ante la Cámara de Delegados de Puerto Rico, y al aprobar el proyecto enmendado, volvió a incorporar en el mismo las anteriores disposiciones sobre concubinato del art. 209 del Código Civil de Louisiana y las disposiciones sobre relaciones ilícitas del Código de 1902. A moción del delegado señor Herminio Díaz Navarro la Cámara de Delegados de Puerto Rico no aceptó las enmiendas, y solicitó conferencia, siendo designados conferenciantes por la Cámara el Presidente señor José de Diego y por el Consejo Ejecutivo el señor Martín Travieso, hijo.

La Comisión de conferencia rindió por escrito el siguiente informe: "Vuestra Comisión de Conferencia a la cual se refirió el asunto de las diferencias surgidas entre ambas cámaras respecto (al) P. de la C. 209, tiene el honor de informar que ha venido a un acuerdo respecto al proyecto de ley en la forma pasada por el Consejo Ejecutivo, con la excepción que la enmienda (tirilla) del Consejo que estará redactada como sigue: '3. Cuando la madre fué conocida viviendo en concubinato con el padre al tiempo del embarazo y del nacimiento del hijo'. Respetuosamente (fdo.) José de Diego—conferenciante de la Cámara (fdo.) Martín Travieso, Jr., conferenciante del Consejo."

Siempre resulta difícil indagar cuál fué la intención legislativa por la interpretación aislada de unos cuantos documentos. Hemos examinado cuidadosamente el Libro de Actas de la Cámara de Delegados de la Primera Sesión de la Sexta Asamblea Legislativa de Puerto Rico del 1911 y el Expediente del Proyecto de la Cámara 209 de la Primera Sesión de la Sexta Asamblea Legislativa del 1911 y la traslación de las certificaciones correspondientes a nuestra anterior Secretaría Ejecutiva, hoy Departamento de Estado, para la promulgación de la ley, y menos la descripción de ciertas rutinas parlamentarias escuetamente anotadas, no tenemos más datos para una crítica de exactitud que los tres documentos que hemos reseñado.

Empezaremos por demostrar los elementos indubitados de la interpretación. Es indudable que el proyecto original de la Cámara de Delegados pretendió restablecer casi en su totalidad la institución de derecho civil española que contenía el Código del 1889, mientras que el Consejo Ejecutivo pretendió mantener casi en su totalidad la doctrina norteamericana del Código Civil de Louisiana del 1825. Es indudable que la pretensión que triunfa en este caso es la del Consejo Ejecutivo y no la de la Cámara de Delegados. Es indudable que en cuanto al inciso 1, la teoría española del reconocimiento por parte del padre: "cuando exista escrito suyo indubitado en

que expresamente reconozca su paternidad", se impone sobre la teoría del Código Civil de Louisiana que permite el reconocimiento cuando "por toda clase de documentos privados (*by all kinds of private writings*) en los cuales el padre haya reconocido al bastardo como su hijo o lo haya designado como tal." Es indudable que en cuanto al inciso 2, la teoría española del Código, del 1889 que dispone la obligación de reconocer al padre "cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia", (el Código Civil español exige "actos *directos* del mismo padre" mientras el nuestro sólo exige "actos del mismo padre"), se impone sobre la teoría del Código Civil de Louisiana que dispone dicha obligación: "cuando el padre, bien pública o privadamente lo haya reconocido como su hijo o lo haya así nombrado como tal en una conversación o lo haya educado como tal hijo." Es indudable que en cuanto al inciso 3, que por cierto es el único inciso que aparece enmendado por eliminación de parte del texto, que dispone la obligación de reconocer al padre "cuando la madre fué conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo", es una reproducción casi literal del inciso 3 del art. 209 del Código Civil de Louisiana que dispone la obligación de reconocer al padre, "cuando la madre del niño fuera conocida viviendo en concubinato con el padre en la casa de dicho padre al tiempo de la concepción del hijo." Es indudable que la anterior disposición del art. 189 de nuestro Código del 1902 que disponía la obligación del padre de reconocer al hijo ilegítimo "cuando éste haya nacido llevando sus padres relaciones amorosas", se transforman en el inciso 4 del proyecto aprobado en conferencia en la obligación de reconocer: "cuando el hijo pueda presentar cualquier prueba *auténtica de su condición de hijo natural.*"

Bueno es hacer una pequeña digresión sobre el cambio que sufre el inciso 4. Tanto en el proyecto original propuesto por el Consejo Ejecutivo, como en el proyecto endosado por

el Comité de Conferencia, como en la certificación expedida por don José Muñoz Rivera, Secretario de la Cámara de Delegados, en cuanto a la forma final en que se aprueba el proyecto 209 por la Cámara de Delegados y el Consejo Ejecutivo, el inciso 4 leía así: "cuando el hijo pueda presentar cualquier prueba auténtica de su condición de hijo natural". Sin embargo de las actas del Consejo Ejecutivo se desprende que la redacción última del inciso 4 se hace por la Cámara de Delegados y se acepta por el Consejo Ejecutivo, como veremos más adelante. A primera vista parece una simple corrección de estilo, o el caso previsto por Seignobos en su famoso método, donde nos advierte que "la mayor parte de las afirmaciones contenidas en un documento son de segunda mano, cuando no de tercera."

Es indudable asimismo que el Proyecto de la Cámara núm. 209 representa una reconciliación entre las disposiciones, algunas en abierto conflicto, de los arts. 119, 129, 131, 135, 132 y 133 del Código Civil español y los arts. 208 y 209 del Código Civil de Louisiana y del art. 189 del Código Civil de Puerto Rico del 1902. Es indudable, por otra parte, que mientras el Código Civil español del 1889 permite el reconocimiento del hijo natural en dos casos: (1) escrito indubitado y (2) posesión continua de hijo natural, el Código Civil de Louisiana del 1825 la permite en cinco casos, a saber, (1) escrito indubitado, (2) reconocimiento verbal público del padre del estado filial del hijo, (3) reconocimiento verbal privado del padre de dicho estado, (4) reconocimiento tácito mediante la educación del hijo como tal, (5) concepción del hijo durante el concubinato, y el art. 189 del Código Civil de Puerto Rico del 1902, la permite en siete casos, a saber, (1) escrito indubitado, (2) reconocimiento verbal público del padre del estado filial del hijo, (3) reconocimiento verbal privado del padre del estado filial del hijo, (4) reconocimiento tácito mediante la educación y la alimentación del hijo como tal, (5) concubinato al tiempo del embarazo, (6) concubinato al tiempo del nacimiento y (7) relaciones amorosas al tiempo del nacimiento.

Para llegar a la determinación de la posible evolución que representa el Proyecto de la Cámara núm. 209, no podemos abstraernos del cuadro histórico-jurídico que tenía ante sí el legislador del 1911. La *razón* que debemos reconocer tuvo el legislador del 1911 al establecer la reforma, que en la institución de la naturalidad significa el art. 193 de nuestro Código del 1911, fué la de reconciliar en una forma más sistemática y comprensible las disposiciones contradictorias que contenía el art. 189 del anterior Código del 1902. Los elementos de *espíritu* presentes en la disparidad que se produce entre nuestra Cámara de Delegados, celosa guardiana de un patrimonio histórico que se sentía amenazado por un nuevo orden político y nuestro Consejo Ejecutivo, propulsor de un anexionismo político-jurídico con la nueva metrópolis, son tan claros y precisos, que el motivo de la reconciliación de tendencias trasluce de un extremo a otro del texto.

Ahora bien, la intención legislativa guarda siempre una estrecha relación con la causalidad sociológica del medio donde se produce. Había un problema social lo suficiente denso para que el derecho se pudiera refugiar en su peculiar sistema de abstracciones. El concubinato clásico de las sociedades aristocráticas, donde las diferencias en el abolengo, en la clase, y aún en esa peculiar economía que constituye por sí misma el sistema dotal vedaba el matrimonio normal, al trasladarse a un nuevo espacio americano, habíase transformado en otras clases de relaciones sexuales ilícitas de las cuales debía tomar razón nuestro legislador.

Las relaciones sexuales ilícitas de la sociedad española principalmente consideradas por el derecho histórico español "de damnable y punible ayuntamiento" eran (1) la mancebía (casa de mujeres públicas), (2) el concubinato y como regla de excepción, la nefaria, la incestuosa y la sacrílega. Las otras relaciones sexuales ilícitas reconocidas son las logradas a través de la violencia, como la violación, el estupro, el rapto, que crean cierto estado de derecho después de la declaración judicial correspondiente. No reconoce esa es-

pecie de institución sexual intermedia que en Puerto Rico conocemos como "la querida", la mujer con quien se tiene *relaciones amorosas*, casi siempre seducida por la promesa de matrimonio.

La "querida" puertorriqueña no es una manceba (mujer de la vida) ni una concubina (corteja). Es más bien una entretenida para relaciones amorosas ilícitas, por lo general de carácter extra-matrimonial, que no vive con el hombre bajo el mismo techo, ni éste la mantiene en su totalidad, a pesar de que recibe alguna ayuda, casi siempre en forma de regalos, pero a quien se le conoce durante algún tiempo una sola unión sexual, de la cual puede inferirse con razonable certeza el riesgo maternal. Originalmente empezó como una unión sexual entre un hombre de cierta posición social (señorito) con una "mujer de pueblo" (barragana). La diversidad de relaciones sexuales extra-matrimoniales que ha creado el trabajo femenino fuera del hogar, después de la primera guerra mundial, ha subido el rango de la querida desde la humilde "mujer de pueblo" hasta una mujer de igual categoría social y espiritual que el hombre dentro del sistema de clases que instaura la sociedad burguesa.

Ya el art. 189 del Código del 1902 establecía la obligación del padre de reconocer al hijo ilegítimo cuando éste naciera "llevando sus padres relaciones amorosas", lo cual no tiene antecedentes, ni en el Código Civil español del 1889 ni en el Código Civil de Louisiana del 1825. De manera pues, que desde el 1902, nuestra legislación civil sintió la obligación de reconocer entre las uniones sexuales ilícitas, además del concubinato, *las relaciones amorosas al tiempo del nacimiento*, como probabilidades de responsabilidad paterno-filial.

Ahora bien, relaciones amorosas al tiempo del nacimiento, puede tener un hombre con una mujer embarazada por otro hombre. Como cuestión de experiencia sociológica, el momento en que siempre se produce el abandono de la mujer por el hombre, en esta clase de relaciones amorosas ilícitas, es

cuando la mujer queda embarazada. Las estadísticas de nuestro servicio social comprueban este tipo de conducta hasta la saciedad. Es el momento cuando el instinto maternal de la mujer tiene que enfrentarse con el egoísmo social de un hombre que no quiere tener descendencia ilegítima. Casi siempre la mujer abandonada tiene que refugiarse en otro amor ilegítimo, por lo general de carácter concubinario, con un hombre de inferior categoría social o económica a la categoría social o económica del primer hombre, para salvar el fruto de su vientre. No son poco frecuentes los casos en que el segundo hombre está conforme en reconocer como descendencia propia, el hijo de la primera relación sexual ilícita de su concubina.

Sin duda, éste es el hecho sociológico que mueve la conciencia del legislador a cambiar en el 1911, el contenido dubitativo de la disposición del 1902 que hace depender la filiación del momento del nacimiento, por la clásica disposición del derecho civil español, que hace depender la filiación del momento de la concepción. Así quedaban resueltas satisfactoriamente todas las circunstancias que pudieran hacer sospechosa la legitimidad natural.

Ahora bien, ¿por qué se cambia el concepto de "prueba auténtica de su condición de hijo natural" originalmente propuesto por el Consejo Ejecutivo y aceptado en conferencia por la Cámara de Delegados por el concepto de "prueba auténtica de su parternidad" en el inciso 4? Por el Diario del Consejo Ejecutivo de Puerto Rico de la Sesión Legislativa del 1911 (*Journal of the Executive Council of Puerto Rico—Legislative Session* 11) sabemos que fué una última enmienda propuesta por la Cámara de Delegados y aceptada por el Consejo Ejecutivo, después de la Conferencia. Es indudable que en los elementos subconscientes de la redacción ha pesado en el ánimo del legislativo el concepto "paternal descent", (descendencia paterna del art. 208 del Código Civil de Louisiana). Pero además ha pasado una cosa muy importante para el estudio de esta institución.

Como se recordará en el proyecto original propuesto por el señor José de Diego y aprobado por la Cámara de Delegados, se insertó una disposición que leía de la siguiente manera: "cuando el padre o la madre hiciere el reconocimiento separadamente, no podrá revelar el nombre de la persona con quien hubiere tenido el hijo, ni expresar ninguna circunstancia por donde pueda ser reconocida", o sea una disposición idéntica a la que contiene el art. 132 del Código Civil español del 1889, característico de aquellos Códigos, que como el español, no permiten la investigación de la paternidad, sino de una manera indirecta, o sea, como una declaración judicial de un anterior reconocimiento voluntariamente realizado por el padre por actos directos suyos o de su familia. Esta disposición fué tachada expresamente del proyecto original de la Cámara de Delegados por el Consejo Ejecutivo. Parece que hasta última hora se trató de que prevaleciera en el texto, pues en el último informe remitido por la Cámara de Delegados al Consejo Ejecutivo solicitando la concurrencia de este último cuerpo, después del informe rendido por el Comité de Conferencias, transcrito parcialmente en el acta de la última sesión del Consejo, las dos únicas referencias que constan de la redacción final del Proyecto de la Cámara número 209, son en el sentido de mostrar la conformidad de la Cámara de Delegados para que se eliminara la disposición: "cuando el padre o la madre hiciere el reconocimiento separadamente, no podrá revelar el nombre de la persona con quien hubiere tenido el hijo, ni expresar ninguna circunstancia por donde pueda ser reconocida" y solicitar la nueva redacción del inciso 4 "cuando el hijo pueda presentar cualquier prueba auténtica de su *paternidad*", lo cual explica el nuevo texto, pues habiéndose roto la barrera tradicional de la prohibición de investigar la paternidad, contenida en el Código Civil español del 1889, quedaba abierto el campo a *cualquiera indagación judicial sobre la paternidad*, que era el verdadero espíritu del Código Civil de Louisiana del 1825, pues sabido es, que entre los países que adoptaron el sistema de investigación de la paternidad, en

ciertos casos están *Louisiana* y Portugal, 1 Manresa 634— (Edición del Instituto Editorial Reus), (1943). Suceso de extraordinaria importancia es éste, del cual parece no haberse percatado en toda su significación nuestra jurisprudencia patrimonial, que hubiera podido cambiar toda la filosofía de su interpretación, en cuanto a los dos últimos incisos se refiere, ya que desde 1911, Puerto Rico estaba incluído entre los países donde se puede investigar la paternidad.

Concluímos: que el inciso 4 del anterior art. 193 del Código Civil de Puerto Rico, (ed. de 1911), que forma hoy el art. 125 del Código Civil de Puerto Rico, (ed. del 1930), todavía en vigor, estuvo diseñado para hacer forzoso el reconocimiento, cuando de cualesquiera relaciones sexuales ilícitas, mantenidas por el padre y la madre natural, hoy también por el padre y la madre adulterinos, que no pudieran considerarse como concubinato, se infiera el hecho de la paternidad. La única limitación impuesta por el inciso 4, es, que la prueba de las relaciones sexuales ilícitas sea suficiente para establecer claramente el hecho de la paternidad.

Se ha sugerido la posibilidad que las palabras "cualquier prueba auténtica" se refiera exclusivamente a prueba documental. El problema pues, es determinar si en la redacción del inciso 4 del art. 125 que dice: "cuando el hijo pueda presentar cualquier prueba auténtica de su paternidad", las palabras "cualquier prueba auténtica", se utilizan como una acepción jurídica consagrada por el uso en la ciencia del derecho, o como un término comprendido dentro de la redacción gramatical o como una simple proposición dentro de la lógica para un raciocinio inmediato.

Es conveniente dejar anotado que cuando el art. 125 habla de la forma documental de la prueba del reconocimiento, usa las frases "documento público", (segundo párrafo), y "escrito indubitado" (documento privado), (primer inciso), ambas acepciones tomadas del derecho civil español.

Manresa al comentar el art. 125 del Código Civil español, que concuerda exactamente en sus dos únicos incisos con los

dos primeros incisos de nuestro art. 125, nos dice, que dentro de la frase "escrito indubitado está incluído el documento público": 1 Manresa 632, (Sexta ed. del Instituto Editorial Reus), (1943). También Manresa, a la pág. 622 del mismo texto, al hablar sobre la forma de reconocimiento de un hijo natural, de acuerdo con el art. 131 del Código Civil español, que forma parte asimismo de nuestro art. 125, nos advierte, que la frase "documento público" comprende todos los que están incluídos en el art. 595 de la Ley de Enjuiciamiento Civil española, o sea, (1) las escrituras públicas con arreglo a derecho; (2) . . . . .; (3) los documentos expedidos por los funcionarios que estén autorizados para ello en lo que se refiera al ejercicio de sus funciones; los libros de actas . . . registros, . . . . y demás documentos que se hallen en los archivos públicos o dependientes del estado, de las provincias o de los pueblos y las copias sacadas y autorizadas por los secretarios y archiveros por mandato de la autoridad competente; (5) . . . . . . ; (6) las partidas o certificaciones de nacimiento, de matrimonio y de defunción dadas con arreglo a los libros por los párrocos o por los que tengan a su cargo el Registro Civil; (7) las ejecutorias y las actuaciones judiciales de toda especie.

De acuerdo con la glosa española, que resulta ser la de mayor corrección científica para la interpretación de los dos primeros incisos de nuestro art. 125, ya que los mismos están tomados literalmente del art. 135 del Código Civil español, si se le solicita al padre el reconocimiento forzoso de un hijo natural bajo el inciso 1 de nuestro art. 125, o sea, "cuando exista *escrito suyo indubitado* en que expresamente reconozca su paternidad", puede presentarse cualquier documento privado (escrito indubitado) o cualquier documento público para probar el reconocimiento.

"Prueba" es un término genérico que incluye tanto la prueba instrumental o documental como cualquiera otra especie de prueba. La terminología forense española ha definido la prueba como aquella averiguación que se hace en juicio de

una cosa dudosa, o, el medio con que se muestra y se hace patente la verdad o falsedad de alguna cosa; existiendo dos categorías de prueba, la plena y la semiplena. Según el Diccionario de Legislación y Jurisprudencia de Escriche Tomo 4, pág. 755, (ed. de la Imprenta de Eduardo Cuesta), (1876), la prueba plena, que también se conoce como completa o perfecta, es la que manifiesta sin dejar duda alguna, la verdad del hecho controvertido, y la prueba semiplena, que también se conoce como incompleta o imperfecta, es la que por sí sola no demuestra con claridad el hecho controvertido. Se considera como prueba plena: (1) la confesión de parte hecha en juicio, (2) *la declaración de dos o más testigos contestes*, (3) las escrituras u otros documentos públicos, (4) la evidencia o inspección ocular del Juez. Se considera como prueba semiplena: (1) la deposición de un solo testigo, (2) la confesión extrajudicial, (3) el cotejo de letras (en documento privado), (4) la fama pública por sí sola sin el apoyo de testigos idóneos, (5) el juramento supletorio y (6) las presunciones.

De acuerdo con la Enciclopedia Jurídica Española Tomo 26, pág. 395, (ed. de Francisco Seix) (1910), "prueba" es la demostración satisfactoria de una afirmación cuya realidad no se impone por sí misma. Los medios de prueba, (pág. 396), son cuatro: (1) la confesión del adversario, llamada prueba vocal, (2) la producción de testigos, llamada prueba testifical, (3) la de títulos, llamada prueba instrumental, y (4) las presunciones, llamada prueba conjetural.

No hemos encontrado sin embargo, en la terminología forense española la expresión "prueba auténtica". Hemos encontrado "copia auténtica", "persona auténtica", "pena de la auténtica", "auténtica de las instituciones", "auténticas del Código", "auténticas de las Novelas", "auténticas 'si qua mulier' ": 3 Enciclopedia Jurídica Española 823 y 824, (ed. de Francisco Seix) (1910); "acto auténtico", "documento auténtico", "título auténtico": 1 Diccionario de Derecho Privado 560—(ed. de la Editorial Labor S. A.), (1950). Se dice también auténtico, "el sugeto honrado constituído en dignidad

como conde, duque o marqués *que merece sér creído*": 1 Escriche—Diccionario Razonado de Legislación y Jurisprudencia 878, (ed. de Carlos Bailly–Bailliere), (1874). "La locución *persona auténtica* hallase usada en la ley 1ª tít. XVIII de la Partida 3ª; no está conforme la edición de Gregorio López con la oficial de la Academia de la Historia; según la edición de Gregorio López es persona auténtica la constituída en alta dignidad, y según la de la Academia toda persona fidedigna": pág. 823 del tomo citado de la Enciclopedia Jurídica Española.

Habiéndose tomado los dos últimos incisos de nuestro art. 125 del Código Civil de Louisiana, justo es indagar si existe en la terminología jurídica norteamericana la frase "prueba auténtica", como una frase consagrada por el uso forense. En la versión inglesa contemporánea del 1911, el inciso 4 de nuestro art. 125: "cuando el hijo pueda presentar cualquier *prueba auténtica* de su paternidad", se tradujo como "when the child may present any *authentic evidence* of his paternity". Empezaremos por consignar que la palabra "prueba" (*proof*) y la palabra "evidencia", (*evidence*) se usan indistintamente.

"Prueba" (*proof*) en terminología jurídica norteamericana también resulta un término genérico que incluye: cualquier hecho o circunstancia factual que dirija la mente del juzgador hacia una conclusión adelantada por el ofrecimiento; la razón suficiente en lógica para aceptar la veracidad de cualquier proposición anticipada; en un sentido jurídico estricto, incluye todo lo que pueda presentarse en un juicio, dentro de las reglas corrientes de admisibilidad, con el propósito de producir cierto grado de convicción razonable, o sea, todo aquéllo que tenga fuerza probatoria intrínseca por sí mismo, y no meramente como una deducción de los hechos probados. Evidencia (*evidence*) es un concepto más específico y limitado (*narrower*) que comprende únicamente aquellas clases de prueba que puede ser legalmente ofrecida en un juicio por la actuación del actor, a través de testigos, escritos (*records*) y otros documentos. "Prueba" en el sentido técnico más estrictamente preciso, significa el resultado o el efecto de

la *evidencia* admitida, mientras que "evidencia" es el vehículo o los medios por los cuales un hecho puede ser probado." La prueba es la conclusión que puede extraerse de la evidencia. "Cuando la palabra *prueba* se usa en una Ley significa cualquier evidencia legal y competente, como testimonios recibidos de acuerdo con las reglas fundamentales de la admisibilidad y excluye cualquiera evidencia de referencia, no importa lo creíble que parezca": Black's *Law Dictionary*, Henry Campbell Black pág. 1380, (Cuarta ed. de la West Publishing Company), (1951); Ballentine, *Law Dictionary with Pronunciations*, James A. Ballentine, pág. 1032, (ed. de Lawyers Co-operative Publishing Company), (1948).

No hemos encontrado tampoco en la terminología forense norteamericana, siquiera en el exhaustivo sistema de contraindicaciones que contienen los diccionarios terminológicos norteamericanos, la frase "authentic proof" o "authentic evidence" como teniendo un significado propio, consagrado por el uso judicial. Como término de relación hemos encontrado "authentic act", "authentics", "authentic interpretation of law". Como cuestión de hecho, cuando el término de relación se usa unido a documentos o escritos se dice: "authenticated copy of patent", (copia certificada de una patente), "authenticated copy of records of judgments" (copia certificada del legajo del fallo), "authenticated report" (informe autenticado); 4 Words and Phrases 825 et seq., suplemento hasta 1954, pág. 156. En el diccionario terminológico de Black antes citado, a la pág. 168, la palabra *authentic* (auténtica) tiene las siguientes acepciones: "(1) genuino, (2) verdadero, (3) real, (4) puro, (5) confiable, (6) digno de confianza, (7) que tiene el carácter y autoridad de un original, (8) debidamente investido de todas las formalidades exigidas y legalmente atestiguado, (9) competente, (10) *creíble*, (11) *confiable como cuestión de evidencia*." Por lo visto, no nos encontramos en este caso, dentro de la peculiar situación de Puerto Rico, donde el uso de dos idiomas y la interacción de

dos sistemas jurídicos, ha creado cierta corrupción en los conceptos jurídicos tradicionales.

No habiendo encontrado en la terminología forense española, siempre cuidadosa en la correcta fijación de los conceptos jurídicos, ni en la terminología forense norteamericana, un poco más arbitraria, como debe esperarse de un derecho en proceso de formación nacional, pero siempre atenta a la evolución judicial de sus conceptos jurídicos, la frase "prueba auténtica" como una individualización terminológica consagrada por el uso jurídico, podemos descartar la regla de hermenéutica contenida en el art. 16 de nuestro Código Civil en el sentido que "los términos técnicos y las frases usadas en las artes y en las ciencias se interpretarán según el significado y acepción que tengan admitidos por los peritos o maestros en la ciencia, arte o profesión, a la cual se refieran."

Si llegáramos a la conclusión que las palabras del inciso 4 "cualquier prueba auténtica" son equivalentes a "cualquier *documento auténtico*" o a "*cualquier documento público*", nos encontraríamos frente a un caso de duplicidad de disposiciones dentro del mismo art. 125, de acuerdo con el principio lógico de la identidad, pues el segundo párrafo de dicho artículo, al tratar sobre el reconocimiento voluntario por parte del padre, dice que basta que dicho reconocimiento se haga en el acta de nacimiento o en otro *documento público*. Si llegáramos a la conclusión que las palabras del inciso 4 "cualquier prueba auténtica" son equivalentes a "cualquier escrito indubitado donde el reconocimiento no sea expreso", nos encontraríamos frente a un caso de contrariedad, de acuerdo con el principio lógico de la contradicción, pues si el reconocimiento no se hace en una forma expresa, nunca será el escrito suficiente por sí mismo para probar el reconocimiento, como lo prueba el escrito expreso que además resulte indubitado. Siendo esto así, se necesitará prueba de otra clase para conectar dicho escrito con el hecho de la paternidad, y entonces, no hay razón para dejar circunscrita al simple documento la acción filiatoria del inciso 4. Así lo comenta Manresa, refiriéndose al punto es-

pecífico del carácter de expresividad del documento indubitado: "Sin embargo en cada caso decidirán los Tribunales, *y cuando el escrito por sí solo* no reconozca de un modo suficientemente expresivo la paternidad, servirá de base para acreditar, en unión con otros datos, la posesión constante del estado del hijo a los efectos de este artículo y con arreglo a su número 2". 1 Manresa 636, 637, igual ed. antes citada. Es indudable, pues, que el reconocimiento será obligatorio para el padre: (1) cuando exista escrito suyo indubitado en que reconozca su *paternidad,* y (2) cuando el hijo pueda presentar cualquier prueba de su *paternidad.* Lo importante es que el hecho de la *paternidad,* o sea *la relación ilícita al momento de la concepción* y no del nacimiento, quede judicialmente establecida mediante un escrito, o en virtud de cualquiera prueba que merezca ser creída.

Estamos pues, frente a uno de esos casos donde el uso corriente y usual de una palabra dentro de una norma, puede confundirse con una posible acepción de carácter jurídico, pero que después del correspondiente análisis terminológico, queda reducida a su habitual significación como voz de uso popular. Como establece el art. 15 de nuestro Código Civil "las palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de la frase". En Puerto Rico es corriente el uso de la palabra "auténtico" como algo que significa legítimo, genuino, verdadero, "las raíces auténticas de nuestra cultura", "la personalidad auténtica del puertorriqueño", "es el sentir auténtico de esta mayoría", "demostración auténtica de sus facultades creadoras", "el auténtico espíritu religioso de nuestro campesino." Castán, en su notable tratado de Derecho Civil Español, Común y Foral, Vol. 1, final de pág. 776 y principio de pág. 777—(ed. del Instituto Editorial Reus) (1949), nos dice que "la interpretación de la ley ha de tener siempre en cuenta los usos generales del lenguaje, puesto que la norma se dirige a la generalidad, a todos los súbditos, mien-

tras la interpretación de los negocios jurídicos pueden en ocasiones fundarse sobre los usos individuales."

Hay una interpretación de nuestro propio tribunal bastante contemporánea con la adopción legislativa del nuevo inciso 4, (1911–1914), donde el ilustrado Juez Presidente de este tribunal, señor Hernández, se expresa de la siguiente manera: "Además de no serle aplicables los tres primeros casos del artículo 193 de la sección 1ª de la Ley número 73 de marzo 9, 1911, tampoco está comprendida en el caso 4º, pues no ha presentado prueba auténtica de la paternidad de . . . . *No define ese artículo cuál sea la prueba auténtica a que se refiere,* pero por el espíritu que lo informa tendente a exigir *prueba más convincente de la filiación* que la que anteriormente se exigía por el artículo 189, y por el principio *noscitur a sociis, bien podemos deducir que esa prueba auténtica debe ser tal que pueda equipararse* a la determinada por un escrito indubitado de expreso reconocimiento, por la posesión continua de hijo natural, y por el concubinato de la madre con el padre, durante el embarazo y al tiempo del nacimiento del hijo", o sea, prueba de todas clases, pero dentro del grado de credibilidad tradicionalmente conocido como "prueba robusta y convincente": *Méndez* v. *Martínez,* 21 D.P.R. 252, cita precisa a la pág. 270. El mismo criterio adopta el ilustrado juez sentenciador en el presente caso.

El ilustrado juez sentenciador no tuvo, sin embargo, al momento de fallar el caso, el beneficio de la amplia discusión que sobre la regla de la "prueba robusta y convincente" se hizo en nuestra decisión de *Figueroa* v. *Díaz,* 75 D.P.R. 163, *(Negrón Fernández), (Ortiz), (Marrero), (Sifre),* (1953), citas precisas a las págs. 174, 185, 189, 190, 191, 192, 196, donde se resolvió que "nada hay en la ley que exija determinado quantum o calidad de prueba para justificar el cumplimiento de tal requisito" y por lo tanto, los casos de filiación deben resolverse de acuerdo "con una auténtica preponderancia de la evidencia". La necesidad de la nueva regla era evidente. Cuando se adoptan los arts. 189 del Código de 1902,

193 del Código de 1911 y 125 del Código de 1930, el legislador consideró una relación sexual ilícita entre un hombre soltero y una mujer soltera, donde es posible una mayor investigación de la paternidad. Cuando se adopta la Ley núm. 229 de 12 de mayo de 1942 y la Ley núm. 243 de 12 de mayo de 1945, el legislador consideró una relación sexual ilícita entre un hombre casado con una mujer soltera o una mujer casada con un hombre soltero, o un hombre casado con otra mujer casada con otro hombre, que no resultaban cónyuges entre sí. Mientras en el caso de la descendencia natural de hombre y mujer solteros, el escrito indubitado puede ser expreso, abierto, deliberado, por no existir conflicto con ninguna otra descendencia legítima, en el caso de la descendencia adulterina del hombre o la mujer casados, el escrito indubitado puede ser menos preciso, más cauteloso, más contradictorio. Mientras en el caso de la descendencia natural de hombre y mujer solteros, la posesión de estado de hijo natural, puede ser continua y notoria, por no existir conflicto con ninguno otro estado matrimonial, en el caso de la descendencia adulterina de hombre o la mujer casados, la posesión de estado de hijo natural puede ser discontinua, menos notoria, más circunstancial. Mientras en el caso de la descendencia natural de hombre y mujer solteros, el estado de concubinato puede ser público y evidente, por no existir conflicto con las relaciones conyugales legítimas, en el caso de la descendencia adulterina del hombre o mujer casados, el estado de concubinato puede estar rodeado por una mayor secretividad y prudencia. Mientras en el caso de la descendencia natural de hombre y mujer solteros, la relación sexual de la cual deba inferirse la paternidad, puede ser manifiesta y espontánea, por no existir conflicto con los intereses sociales de una familia, en el caso de la descendencia adulterina de hombre o mujer casados, la relación sexual de la cual deba inferirse la paternidad, puede estar rodeada por una atmósfera de clandestinidad y mortificación moral. Por esta razón, la anterior jurisprudencia de este tribunal, hasta el año 1942 sobre el art. 125, que se refería al

reconocimiento de hijos naturales de padres solteros, en todo lo referente al reconocimiento de hijos adulterinos de hombre o mujer casados, no tenía base para una aplicabilidad estricta. Por ello, dos Jueces de este tribunal, el Juez Asociado señor Negrón Fernández y el que estas líneas escribe, hemos mantenido el criterio que la investigación de la paternidad adulterina no debe hacerse dentro del marco de la naturalidad tradicional que dispone el art. 125 para hombres y mujeres solteros, y si dentro de una acción civil genérica, donde las relaciones sexuales al momento de la concepción, sean el hecho esencial para el establecimiento de la paternidad.

Es bueno dejar consignado asimismo, como un paréntesis analógico, que al adoptarse el Artículo 43, párrafo cuarto de la Constitución de la República Española de 9 de diciembre de 1931, que declaraba: "las leyes civiles regularán la investigación de la paternidad", aunque se trataba de un "precepto meramente programático" (que) "quedó sin desarrollo por no haberse dictado ley alguna sobre esta materia,"—1 Manresa 635, escolio 2, edición anteriormente citada—, el Tribunal Supremo de España declaró, por la simple norma constitucional, "que se había de dar al artículo 135, no menos que a los que regulan la investigación de la paternidad de los hijos ilegítimos no naturales, *no la interpretación restrictiva* preconizada por la jurisprudencia tradicional, *sino la meramente declarativa,* pudiendo tenerse en cuenta el espíritu que informa el *artículo* 43 de la Constitución de la República como elemento interpretativo": 1 Manresa 638, escolio (1), ed. anteriormente citada. La razón es demasiado obvia para que merezca un conmentario exhaustivo. La constitución es siempre una norma general impuesta "por el brazo poderoso de todas las gentes", que aupan un principio inalienable para toda la vida de un pueblo. Es la única interpretación eterna de una realidad jurídica.

En el caso de Puerto Rico, debemos atender primero, a la norma legislativa de la Ley núm. 73 de 9 de marzo de 1911, donde siguiendo un principio parecido al del Código Civil de

Louisiana, se permitió la investigación de la paternidad, a pesar de lo renuente que se ha mostrado nuestra anterior jurisprudencia a reconocer un hecho legislativo colmado de significación humana para el porvenir; segundo, a las normas legislativas de la Ley núm. 229 de 12 de mayo de 1942 y de la Ley núm. 243 de 12 de mayo de 1945, extendiendo el reconocimiento a los adulterinos (bastardos); tercero, a la norma constitucional contenida en la Sección 1 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico de 25 de julio de 1952 que dice: "la dignidad del ser humano es inviolable, todos los hombres son iguales ante la ley; no podrá establecerse discrimen alguno por motivo de raza, color, sexo, *nacimiento*, origen o condición social, ni ideas políticas o religiosas"; cuarto, a la norma legislativa de la Ley núm. 17 de 20 de agosto de 1952 que declara: "todos los hijos tienen respecto a sus padres y a los bienes relictos por éstos, los mismos derechos que corresponden a los hijos legítimos" a partir de 25 de julio de 1952. Independientemente de los distintos derechos concedidos por las distintas leyes, para los hijos nacidos con anterioridad al 25 de julio de 1952, hay un aspecto normativo de interpretación, de nueva actitud, de nueva mentalidad, que debe reflejarse sobre toda la institución de derecho del reconocimiento natural y adulterino.

Es indudable que la prueba que tuvo ante sí la ilustrada sala sentenciadora, dentro de la teoría de la preponderancia de la prueba que hemos adoptado, es suficiente, a los únicos efectos de llevar el apellido del alegado padre, para demostrar el hecho de las relaciones sexuales al momento de la concepción, del cual puede inferirse la paternidad.

Siguiendo la regla adoptada por la mayoría de este tribunal, en el sentido que dicho reconocimiento puede establecerse dentro de las distintas modalidades de prueba autorizadas por el art. 125 del Código Civil de Puerto Rico, tal prueba resulta además suficiente para establecer un estado filial de acuerdo con el inciso 4 de dicho art. 125.

Por las razones expuestas me veo obligado a disentir.