MERCEDES BERDECÍA, demandante y recurrida, v. ELIZABETH TYRELL HOWARD Y OTROS, demandados y recurrentes.

Número 134.

*Sometido:* 5 de mayo de 1961. *Resuelto:* 23 de mayo de 1961.

*Benjamín Ortiz, Carlos E. Colón, Luis A. Negrón López* y *Lorenzo Lagarde Garcés,* abogados de los recurrentes; *Héctor Lugo Bougal,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Mercedes Berdecía inició en 18 de agosto de 1952 una acción de filiación ([1]) contra los miembros de la sucesión de Félix Saurí Tyrell, ([2]) fundada en las causas de concubinato y posesión de estado. Alegó que nació el día 3 de octubre

---

([1]) Se unieron otras causas de acción—nulidad de institución de herederos e inexistencia de contratos—cuya resolución final depende del resultado de la acción de filiación. No es necesario que consideremos este aspecto de la controversia.

([2]) Félix Saurí Tyrell falleció intestado, en estado de soltería, en 3 de diciembre de 1938.

de 1928(³) como resultado de las relaciones amorosas y el concubinato existente entre dicho Félix Saurí y su madre natural Dolores Berdecía, quienes al tiempo de su concepción y nacimiento podían contraer matrimonio, sin impedimento alguno, y que la demandante gozó de la posesión continua del estado de hija natural de su padre mencionado, justificado este hecho por "actos inequívocos y expontáneos (sic) de él, quien requirió una comadrona que atendiera a Dolores Berdecía durante el parto, reconoció ante dicha comadrona y otras personas que la criatura por nacer era hija suya y, posteriormente al nacimiento, proveyó a la subsistencia, medicina, atención médica y alimentación de la misma y trató continua, franca y abiertamente a esta demandante como hija natural de él, y allá para el 27 de abril de 1928, deseoso él de proveer un hogar para su hija por nacer, le compró una casa que puso en nombre de Dolores Berdecía."

En ocasión anterior la demandante había instado acción para su reconocimiento. La demanda de filiación, que se había radicado en 5 de septiembre de 1935, fue notificada personalmente al presunto padre natural, quien no compareció a formular alegaciones, por lo cual se anotó en autos su rebeldía.(⁴) Sin embargo, este primer intento de la demandante para obtener su reconocimiento por la vía judicial terminó mediante sentencia de archivo por abandono.(⁵)

---

(³) Aun cuando en la demanda original se alegó que la demandante había nacido en 3 de septiembre de 1928, en la contestación a un interrogatorio que le sometió la parte demandada, se aclaró que la fecha correcta es la expuesta en el texto de esta opinión.

(⁴) En cuanto al reconocimiento, la acción se fundó también en las causas de concubinato y posesión de estado. Las alegaciones al efecto son *idénticas* a las del presente caso, con excepción de algunas diferencias de redacción, estilo y orden, que no tienen importancia.

(⁵) Fundándose en que de acuerdo con la Regla 41(*b*) de las de Enjuiciamiento Civil de 1943 (32 L.P.R.A. Ap., R. 41(*b*) esta sentencia constituía una adjudicación en los méritos, el tribunal de instancia desestimó la demanda del presente caso al declarar con lugar la defensa especial de cosa juzgada interpuesta por los demandados. Mediante opinión *per curiam* de 22 de abril de 1956, dictada en el recurso de apelación núm. 11923, resolvimos que la sentencia mencionada no tenía la autoridad

En 10 de marzo de 1959, el tribunal de instancia dictó sentencia declarando con lugar la demanda, y para ello formuló las determinaciones de hecho y conclusiones de derecho que copiamos a continuación:

"1.—Dolores Berdecía o Verdés nació en Coamo el 13 de marzo de 1911. Félix Rafael Saurí Tyrrell nació en Ponce el 6 de abril de 1907, siendo el único hijo varón de una familia adinerada que vivía frente a la Plaza de las Delicias. Dolores comenzó a trabajar ahí de sirvienta en 1925. Ambos eran solteros y no estaban emparentados entre sí. A fines de 1926 Félix Rafael la enamoró y sostuvo con ella relaciones carnales a escondidas de sus padres. Dolores salió encinta de él en enero de 1928 y el 3 de octubre de ese mismo año nació la demandante.

"2.—Esas relaciones continuaron en la misma casa de los padres de Félix Rafael hasta el cuarto mes de embarazo. Él le compró entonces una casa en la Calle Miramar que le costó $62. También sufragó el costo de una ampliación que le mandó a hacer. Dolores se fue a vivir a esta casa con sus padres y una de sus hermanas. Ahí la visitaba Félix Rafael y sostenía con ella relaciones carnales.

"3.—Félix Rafael se graduó de escuela superior en la misma ciudad de Ponce en junio de 1928 y se proponía continuar sus estudios en Estados Unidos. En agosto fue con Dolores y el concubino de una hermana de ella a hablar con la madre de éste que era partera. Félix Rafael le encargó a la comadrona que atendiera a Dolores en el parto y convino en que le pagaría $25.

"4.—Félix Rafael se embarcó para Estados Unidos el 6 de septiembre de 1928. Al siguiente mes nació la demandante. Él regresó de Estados Unidos en junio de 1929. Fue a verla el mismo día que llegó a Ponce y continuó visitando a Dolores hasta septiembre que se embarcó nuevamente para Estados Unidos. Regresó otra vez en el verano de 1930 y reanudó sus relaciones con Dolores hasta que se embarcó de nuevo en agosto del mismo año. En 1931 no vino a Puerto Rico. Regresó en

de cosa juzgada ya que el pleito anterior de filiación no se encontraba *pendiente* cuando comenzaron a regir las Reglas de 1943; y por el mismo fundamento, dictamos sentencia en 23 de octubre de 1958 revocando al Tribunal Superior, Sala de Ponce, y devolviendo el caso para que se procediera a resolver las otras cuestiones planteadas.

el verano de 1932, pero no volvió donde Dolores ni tuvo más relaciones con su hija.

"5.—Desde Estados Unidos Félix Rafael le enviaba a Dolores $20 mensuales para ella y la niña. Les remitió esta cantidad hasta 1931 ó 1932.

"6.—Félix Rafael vivía en Puerto Rico en casa de sus padres. Siempre les ocultó, igual que a sus amistades, las relaciones que tenía con Dolores. A ésta la visitaba por las noches y regresaba a dormir a su casa. El ambiente familiar y social en que él vivía no era, según se trasluce de la prueba, para hacer ostentación de tales relaciones o del fruto de las mismas.

"7.—Félix Rafael terminó de estudiar en Estados Unidos en 1934 cuando regresó definitivamente a Puerto Rico. En 1935 Dolores lo demandó reclamándole la filiación de la demandante, que entonces era menor de edad. Ese pleito fue archivado por abandono después de emplazado Félix Rafael y de anotada su rebeldía; pero su sola radicación tuvo que contribuir aun más, dado el ambiente familiar y social en que él vivía, a que se abstuviera de toda demostración que delatara el reconocimiento de su paternidad. Él no vivió mucho más. Murió en Ponce el 3 de diciembre de 1938, soltero, intestado y sin otros descendientes que la demandante."

Singular importancia parece tener el único escolio que se adicionó a la opinión del tribunal de instancia y que lee como sigue:

"Hemos examinado la prueba de la demandante con suma cautela por tratarse de un caso entablado después de fallecido el presunto padre. Por esta razón sólo hemos dado crédito a aquella prueba de la demandante que nos lo ha merecido por aparecer comprobada por otros hechos que no han estado verdaderamente en discusión. La referida conclusión núm. 5, que es posiblemente la decisiva en el caso, no la hemos hecho depender tan sólo de la prueba oral que directamente tiende a establecerla, sino de la siguiente declaración de Dolores en la repregunta que coincide con la prueba de la parte demandada sobre los viajes de Félix Rafael (véase la conclusión núm. 4): '¿Podría decirme si cuando él volvió en el verano del treinta y tres, usted se había dejado de él, o él se había dejado de usted, y no tenía relaciones sexuales?' —'Todavía él iba a mi casa' —'¿Está completamente segura de eso que usted dice?'

—'Sí señor. Él ya no iba a mi casa. Él dejó de ir a casa cuando la nena tenía tres años . . . Él le estuvo pasando a la nena hasta que tuvo cuatro años. Él estuvo un año pasándole a la nena, sin ir a casa.' (Págs. 31 y 32 de la transcripción del récord de la vista del 25 de febrero de 1954.)"

Para revisar la sentencia expedimos auto de revisión a petición de la parte demandada. Se señala la comisión de seis errores, que en términos generales, se dirigen a impugnar —por distintos fundamentos—la suficiencia de la prueba para establecer la filiación decretada a base de la posesión continua por la demandante del estado de hija natural de Félix Saurí.([6])

 La ley vigente a la fecha del nacimiento de la demandante, a la cual debemos atenernos a los fines de determinar su derecho al reconocimiento,([7]) es el artículo 193 del Código Civil.([8]) según fuera enmendado por la Ley

---

([6]) Se alega que el tribunal incidió en error: (1) al resolver que se estableció que la demandante es hija natural de Félix Rafael Saurí; (2) al dictaminar que la demandante gozó de la posesión continua de estado de hija natural; (3) al resolver que debía unir la prueba de la paternidad a los hechos probados según la determinación núm. 5 para establecer la filiación de la demandante; (4) al establecer la determinación de hechos núm. 5, ya que la misma no está sostenida por la prueba, en vista de que el tribunal incurrió en error al apreciar la prueba al respecto; (5) al resolver que la prueba de la paternidad era importante para establecer la filiación; (6) al dictar sentencia de filiación sin formular conclusión de derecho alguna en cuanto a la posesión continua de estado.

([7]) *Silva* v. *Doe*, 75 D.P.R. 209, 218 (1953); *Torres* v. *Sucn. Cautiño*, 70 D.P.R. 646 (1949); *Toro* v. *Ríos*, 68 D.P.R. 760 (1948); *Mercado* v. *Sucn. Mangual*, 35 D.P.R. 422 (1926); *Núñez* v. *Lacot*, 32 D.P.R. 81, 84 (1923); *Ex parte Morales*, 30 D.P.R. 907, 910 (1922); *Morales* v. *Sucn. Cerame*, 30 D.P.R. 843 (1922); *Méndez* v. *Martínez*, 21 D.P.R. 252 (1914).

([8]) Con excepción del breve intervalo comprendido entre la vigencia del Código Civil de 1902 hasta la aprobación de la Ley Núm. 73 de 9 de marzo de 1911 (Leyes, pág. 247), las disposiciones legales sobre el reconocimiento forzoso por hallarse el hijo en la posesión continua de estado de hijo natural han permanecido inalteradas desde el 1 de enero de 1890, fecha en que comenzó a regir en Puerto Rico el Código Civil Español en virtud del Real Decreto de 31 de julio de 1889. Véanse, artículo 135 del Código Civil Español, artículo 189 del Código Civil, ed. 1902 y artículo 125 del Código Civil, ed. 1930. No es necesario que resolvamos en el presente caso el efecto de las Leyes Núm. 229 de 15

Núm. 73 de 9 de marzo de 1911 (Estatutos Revisados, 1911, sec. 3263), y que lee como sigue:

" . . . . . . .

"El padre está obligado a reconocer al hijo natural:

"1. . . . . . . . .

"2.—Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia.

"3.—Cuando la madre fue conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo.

"4.— . . . . . . ."

La doctrina en Puerto Rico sobre la prueba necesaria a los fines de lograr el reconocimiento basado en la posesión continua de estado puede comprenderse mejor tomando como hito indicador el memorable legado del Juez Córdova Dávila a nuestro derecho de familia que constituye la opinión de *Colón* v. *Sucn. Tristani*, 44 D.P.R. 171 (1932) y 45 D.P.R. 227 (1933), apelación desestimada por falta de jurisdicción en 71 F.2d 374 (1934), en donde en forma definitiva se inicia una interpretación declarativa, y no restrictiva, de las disposiciones del inciso 2⁹ del artículo 125 del Código Civil, al establecer que si bien evidencia aislada de la paternidad no es suficiente por sí sola para obtener la filiación natural

de mayo de 1942 (Leyes, pág. 1297) y Núm. 17 de 20 de agosto de 1952 (Leyes, pág. 201) en relación con el artículo 125 del vigente Código Civil. Para una discusión completa de la legislación indicada, véase, Álvaro R. Calderón, Jr., *La Filiación en Puerto Rico*, Revista del Colegio de Abogados de Puerto Rico, Vol. XX, págs. 203 y 287 (1960).

Conviene además indicar que, al readoptarse en 1911 las disposiciones que sobre el reconocimiento de los hijos naturales aparecen en el artículo 195, se omitió significativamente en cuanto a la posesión de estado que los actos del padre acreditativos del mismo sean *"directos"*. La Ley 11 de Toro permitía el reconocimiento expreso o tácito, y el hijo podía investigar su origen por todos los medios de prueba inquisitivos de la paternidad; el Código Civil Español impuso limitaciones que impiden la investigación de los actos que hayan mediado entre los padres y se concreta a los *directos y expresos* entre padre e hijo. El artículo 189 del Código Civil de 1902 disponía que el padre estaba obligado a reconocer al hijo "cuando pública o privadamente le tenga por hijo suyo o le haya llamado tal en conversación o se ocupe de su educación y sostenimiento."

fundada en la posesión de estado, este hecho, unido a otros actos relativos a dicha posesión, puede ser considerado a los fines de dejar satisfactoriamente establecida la filiación del hijo.[9] Específicamente se resolvió que los medios de prueba en Puerto Rico, por permitirse la investigación de la paternidad, son mucho más amplios que los que existían bajo el Código Civil Español (a la pág. 179) y que la paternidad es un elemento del cual no puede prescindirse. Esta interpretación del concepto de posesión de estado ha sido fortalecida con nuestra reciente declaración que no es necesario establecer la filiación con prueba robusta y convincente, si por esto se entiende que se requiere un grado superior a la preponderancia de la evidencia. *Figueroa* v. *Díaz*, 75 D.P.R. 163 y 178 (1953) ; *Ortiz* v. *Martorell*, 80 D.P.R. 544 (1958).

Hemos examinado con gran cuidado la prueba testifical y documental que tuvo ante sí el tribunal a quo, y examinada a la luz de la doctrina *actual* de este Tribunal Supremo, estamos completamente convencidos de que la demandante probó cumplidamente su derecho al reconocimiento por haber estado en la posesión continua de estado de hija natural de Félix Rafael Saurí, a base de los hechos que declaró probados el Tribunal Superior, y que satisfacen plenamente lo expuesto en *Colón* v. *Sucn. Tristani*, supra. Las relaciones sexuales entre el padre y la madre de la demandante, su atención a las necesidades de ésta antes y después del alumbramiento en consideración al hecho de que cargaba el fruto de esas relaciones—compra de casa, pago de los gastos de la ampliación de dicha casa y gestiones para obtener los servicios de una comadrona—su ayuda económica para el sostenimiento de la criatura durante los primeros años de su vida, y sus visitas a la niña apenas regresaba de sus viajes de estudio, demues-

---

[9] Se sostuvo que los siguientes actos eran suficientes para establecer la posesión de estado: (1) cuando a la fecha de la concepción del hijo la madre era la querida del presunto padre; (2) que éste visitaba a aquélla con frecuencia, le daba dinero y pagaba la casa; (3) que él pagó los servicios de la comadrona que asistió a la madre en el alumbramiento; y (4) que el padre realizó algunos actos aislados de cariño hacia el hijo.

tran que la demandante gozó de la posesión de estado de hija natural de su padre. Es bueno recordar que debido a las diferencias sociales y económicas existentes, no puede esperarse que los actos de reconocimiento sean tan ostensibles y manifiestos como si se tratara de un hijo legítimo, *Vega* v. *Sucn. Vega*, 32 D.P.R. 595 (1923), que no es indispensable que los actos de reconocimiento se prolonguen desde el nacimiento del hijo hasta la muerte del progenitor, sino que basta con que lo sean por un tiempo razonable, *Salas* v. *Doe*, 75 D.P.R. 571 (1953); *Cruz* v. *Santiago*, 24 D.P.R. 108 (1916); cf. *Toro* v. *Ríos*, 68 D.P.R. 760 (1948); y que, una vez se materializa la posesión de estado por actos del padre, ni las actuaciones posteriores del padre natural o de sus familiares pueden hacer desaparecer el derecho así establecido. *Salas* v. *Doe*, 75 D.P.R. 571 (1953).

Los hechos de esta acción presentan un ejemplo del caso típico de señorito adinerado, que para satisfacer sus primeros apetitos sexuales despertados en el ocaso de la adolescencia, se refugia en la mujer humilde que le sirve, y que probablemente se entrega deslumbrada por la posición social de su seductor, y hasta complacida por la "distinción" de que es objeto. No es más que un vestigio de costumbres de la sociedad feudal trasplantadas a época reciente. No obstante, una vez disipado el calor de la pasión, y ante las consecuencias naturales de estas relaciones, generalmente se impone el egoísmo social, y se pretende borrar y relegar al olvido todo lo acontecido. Cf. *Santiago* v. *Martínez*, 72 D.P.R. 934 (1951).

No hay la menor duda de que durante los primeros cuatro años de su existencia—1928 a 1932—Mercedes Berdecía disfrutó de la posesión de estado de hija natural de Félix Rafael Saurí evidenciada por los actos que ha declarado probados el tribunal recurrido, de por sí suficientes, cf. *Jesús* v. *Sucn. Villamil*, 19 D.P.R. 893, 899 (1913), en donde se dijo que si un demandante puede probar actos claros que se extiendan a un período de seis o siete años, establece un caso prima

facie; y por otros actos que surgen de la prueba presentada y que no se tomaron en consideración al aplicarse rigurosamente la norma de cautela que discutiremos posteriormente. El retraimiento de Saurí pudo deberse a que, a su regreso a Puerto Rico en 1932, ya Dolores Berdecía, madre de la demandante, era concubina de Prudencio Ortiz. Tres años después, en 1935, la demandante inicia su ordalía para obtener el reconocimiento, y ante las alegaciones de la demanda presentada, Saurí permanece silencioso y permite que se le anote la rebeldía. Esta actitud pasiva es reveladora de que los principios morales de Saurí y los dictados de su conciencia le impedían oponerse a la reclamación justa de la demandante.

Del examen de nuestra jurisprudencia, y especialmente de los casos citados por la parte recurrente, resulta claro que en aquellos en los cuales se ha declarado sin lugar la acción de filiación, la prueba fue insuficiente o más débil—*Pabón v. Morales*, 79 D.P.R. 154 (1956); *Sánchez v. Díaz*, 78 D.P.R. 811 (1955); *Miranda v. Costa*, 77 D.P.R. 791 (1954); *Ortiz v. Dragoni*, 59 D.P.R. 14 (1941)—o fueron resueltos bajo el imperio de la regla de la prueba robusta y convincente —*Fontánez v. Sucn. Buxó*, 36 D.P.R. 227 (1927); *Serrano v. Olivero*, 31 D.P.R. 83 (1922); *Méndez v. Martínez*, 21 D.P.R. 252 (1914). En muchos casos el resultado sería distinto si hubiesen sido resueltos después de *Colón v. Sucn. Tristani*, supra, y *Figueroa v. Díaz*, supra, ya que la prueba aducida justificaba que se decretara el reconocimiento, como en *Delannoy v. Sucn. Cividanes*, 53 D.P.R. 114 (1938); *Torres v. Sucn. Caballero*, 39 D.P.R. 724 (1929) y *Charres v. Arroyo*, 16 D.P.R. 816 (1910). De paso deseamos indicar que la prueba presentada en *Vargas v. Jusino*, 71 D.P.R. 389 (1950), resuelto antes del caso de *Figueroa*, hubiese sido suficiente para acreditar la posesión de estado, de conformidad con la posición actual de nuestro derecho.

Hemos comparado la prueba del presente caso con la de otros en que se concedió el reconocimiento y creemos que pasa airosamente cualquier examen en cuanto a su suficiencia. *Salas* v. *Doe*, 75 D.P.R. 571 (1953); *Peña* v. *Sucn. Blondet*, 72 D.P.R. 9 (1951); *Maldonado* v. *Quetell*, 68 D.P.R. 420 (1948); *Bianchi* v. *Bianchi*, 67 D.P.R. 594 (1947); *Cruz* v. *Carrasquillo*, 61 D.P.R. 435 (1943); *Vázquez* v. *Sucn. Boyrié*, 52 D.P.R. 856 (1938); *Olivencia* v. *Paréz Sales*, 49 D.P.R. 911 (1936); *Guadalupe* v. *González*, 34 D.P.R. 669 (1925); *Vega* v. *Sucn. Vega*, 32 D.P.R. 595 (1923); *Cruz* v. *Quiñones*, 31 D.P.R. 339 (1923); *Jesús* v. *Sucn. Villamil*, 19 D.P.R. 893 (1913); *Desmornes* v. *Herederos de Desmornes*, 13 D.P.R. 18 (1907); y especialmente, *Mártir* v. *Hernández*, 73 D.P.R. 132 (1952), con el cual guarda notable similaridad.

Por otro lado, aceptamos, a los fines de la discusión de este caso, que debe mirarse con cautela la prueba de los actos del padre sobre posesión de estado, cuando la acción se inicia después del fallecimiento del pretendido progenitor. *Figueroa* v. *Díaz*, 75 D.P.R. 163 (1953). Sin embargo, ello no quiere decir que se rechace tal prueba, si apreciada en conjunto y enmarcada dentro del cuadro general de la evidencia, especialmente después de un contrainterrogatorio tenaz, permanece incontrovertida en cuanto a su aspecto esencial y sólo ha sido contradicha en extremos que más bien establecen la fragilidad del recuerdo de los testigos sobre detalles insustanciales. Esta norma de cautela no podía aplicarse en la apreciación de la prueba en este caso, pues si bien es cierto que el presunto padre había fallecido para la fecha de la vista del caso, se estableció que durante su vida, la demandante recurrió judicialmente en reclamación del reconocimiento, y éste no compareció a formular alegaciones en cuanto a la demanda presentada que, como hemos dicho anteriormente, *exponía como fundamento para el reco-*

*nocimiento los mismos hechos que aquí se ventilan.* ([10]) Además, como se dijo en *Morales* v. *Sucn. Cerame*, 30 D.P.R. 843 (1922), el caso es distinto cuando se trata de un hijo que tiene pocos años cuando ocurre el fallecimiento de su progenitor. La expresión del tribunal de instancia de que por haber fallecido el presunto padre sólo ha dado crédito "a la prueba de la demandante que nos lo ha merecido por aparecer comprobada por otros hechos que no han estado verdaderamente en discusión" no puede interpretarse en forma tal que resulte, en la práctica, en revivir en los casos de filiación, la criticada regla de evidencia de exclusión de testimonio contenida en la Ley de 10 de marzo de 1904, comúnmente conocida como de "transacciones con finado". *Colón* v. *Sucn. Tristani*, 45 D.P.R. 227 (1933); *Góñez* v. *Palmieri*, 50 D.P.R. 457 (1936); cf. *Danz* v. *Sucn. Suau*, ante, pág. 609 (1961). Aplicando la limitación misma que se impuso el tribunal a quo, la prueba estableció otros hechos demostrativos de la posesión de estado por la demandante que, si bien no son necesarios para el éxito de su gestión judicial, corroboran el resultado a que se llegó finalmente. Así, la madre de la demandante declaró que Saurí decía que la demandante era su hija y la sacaba a pasear en su automóvil (T. E., pág. 31); que le trajo una cuna para la criatura (T. E., pág. 46) y ciertos muebles para la casa de la Calle Miramar (T.E.,

---

([10]) El presente caso es distinguible de *Torres* v. *Sucn. Caballero*, 39 D.P.R. 724 (1929), donde se indica que la prueba debe mirarse con cautela cuando la acción de filiación se inicia después del fallecimiento del padre. Allí se justificó la regla a base de que en tales situaciones la persona a quien se imputan los actos de reconocimiento no puede defenderse de ellos, y son generalmente sus parientes, *desconocedores muchas veces de la vida íntima del difunto*, los que han de defenderle de la imputación; y porque, además, se esperó hasta la muerte del presunto padre para iniciar la acción, a pesar de haber transcurrido un gran número de años desde el nacimiento. La prueba de la Sucn. Saurí trató de establecer que esta familia era muy unida y que sus miembros tenían conocimiento de las intimidades de cada uno. Por otro lado, el presente pleito de filiación no es más que la continuación del que se comenzó en 1935 cuando el presunto padre vivía, y no puede afirmarse propiamente que se esperó hasta el fallecimiento del pretendido padre para iniciar la acción.

pág. 105); y que cuando radicó la primera acción de filiación en 1935, don Rafael Saurí—padre del demandado Félix Saurí—la llevó a la oficina de un conocido abogado ponceño y allí se insistió en que le retirara la representación legal que había encomendado al Lic. Erasto Arjona. [11] El testigo Pedro Allende declaró que cuando Saurí, al regreso de sus viajes de estudio, visitaba la casa de Dolores Berdecía, "la cogía [a la demandante] y la besaba en la frente . . . y la bailaba y se le quedaba mirando" (T. E., págs. 484 y 607); y afirmó además que después de radicarse el pleito en 1935, Saurí le manifestó que no contestaría la demanda "como era hija de él", y que la niña iba a buscar dinero a casa de Saurí (T. E., pág. 492).

Ahora bien, esta actitud de cautela en la apreciación de la prueba que se recomienda en los casos en que la acción de filiación se insta después del fallecimiento del pretendido padre, es a nuestro juicio un corolario derivado de la interpretación restrictiva del artículo 125 del Código Civil que anteriormente prevalecía y de la regla que requería prueba robusta y convincente. Tanto dicha interpretación como la regla mencionada han sido abandonadas en el curso de los años y actualmente rige una interpretación declarativa en el derecho de filiación y, en cuanto al grado de prueba, sólo se exige que haya preponderancia de la evidencia. Por otro lado, no creemos que deba aplicarse en los casos de filiación una regla que no se sigue en los demás pleitos civiles. Debe entenderse, por tanto, que las expresiones contenidas en algunas de nuestras opiniones sobre la precaución que debe adop-

---

[11] Es significativo que en el extenso contrainterrogatorio a que se sometió a la testigo Dolores Berdecía no se le examinó sobre estos puntos, y que, a pesar de la diligencia demostrada para contradecir la prueba de la demandante en detalles cronológicos, no se ofreció el testimonio del abogado ponceño en cuya oficina se alega tuvo lugar la gestión del padre de Saurí. También nos llama la atención el hecho de que cuando el Lic. Arjona renunció la representación en el pleito de filiación—en encomiable descargo de su responsabilidad profesional—hizo constar expresamente que "no estoy de acuerdo con la actora en su idea de renunciar la acción o desistir de ella", corroboración escrita de este aspecto del testimonio de la madre de la demandante.

tarse cuando el presunto progenitor ha fallecido, no representan una regla de evidencia, que tenga *invariablemente* que ser aplicada por el juzgador. Si la evidencia aducida en un pleito de filiación es creída por el tribunal, tomando en consideración todos los elementos que informan el criterio judicial, debe producir el efecto legal correspondiente, no obstante el hecho de haberse radicado el pleito con posterioridad a la muerte del padre, y a pesar de que el hijo hubiese tenido una amplia oportunidad para recurrir a la gestión judicial de su reconocimiento durante la vida de aquél.

Es cierto que la jurisprudencia del Tribunal Supremo de España interpretativa del artículo 135 del Código Civil Español—de redacción similar a nuestro artículo 125 del Código Civil—en la cual descansa la parte recurrente, ha estado dominada por un criterio rígido, estricto y, propiamente caracterizado, estrecho.(12) De ahí que se haya sostenido que la posesión continua de estado se refiere a actos constantes e ininterrumpidos reveladores de la voluntad firme y deliberada del padre de tener por hijo al que pretende ser reconocido; que no puede ser establecida por presunciones sino únicamente mediante prueba directa; y que se exija un conjunto de actos notorios y reiterados que, por la naturaleza de sus circunstancias determinan una situación de hechos de carácter permanente que en última instancia son acreditativos de la voluntad firme del padre de reconocer al hijo.(13)

---

(12) Véanse, *Antonio Martínez Radió: Notas Acerca de la Filiación Ilegítima No Natural,* Revista de Derecho Privado (1957) Vol. XLI, pág. 363; Manuel Albaladejo García: *El Reconocimiento de la Filiación Natural,* Barcelona (1954); Antonio Cicu: *La Filiación,* traducción de Giménez Arnau y Santacruz, Madrid (1930).

(13) Sentencias del Tribunal Supremo de España de 28 de octubre de 1954 (Revista de Derecho Privado, Vol. XXXIX, pág. 799), 26 de abril de 1951 (34 Jurisp. Civil, II, pág. 926; 2 de febrero de 1948 (21 Jurisp. Civil, III, pág. 311); 25 de junio de 1946 (15 Jurisp. Civil, III, pág. 354); 27 de diciembre de 1944 (8 Jurisp. Civil, II, pág. 866); 1 de mayo de 1945 (Revista Derecho Privado, Vol. XXIX, pág. 187; 28 de noviembre de 1941 (*op. cit.,* Vol. XXVI, pág. 61); 3 de julio de 1941 (Vol. XXV, pág. 582).

El rigor de este criterio hermenéutico ha llegado hasta el extremo de negar la filiación a base de actos de la familia del pretendido padre, por tratarse el reconocimiento de un acto personalísimo, "facultad privativa del padre . . . y la omisión de su ejercicio no puede ser suplida por ninguna otra persona por muy allegada que al mismo sea". (Sentencia Núm. 36 de 2 de febrero de 1948, 21 Jurisp. Civil, III, pág. 311.) Y aun más, se ha desestimado la acción, cuando el padre premuerto reconoció la paternidad antes del nacimiento del hijo póstumo, y se demostró la posesión de estado a base de actos de los abuelos (Sentencia de 25 de junio de 1946, Revista de Derecho Privado, tomo XXX, pág. 875).

Sin embargo, a medida que se pondera serenamente esta actitud interpretativa veremos que responde a una serie de factores peculiares al medio y a la legislación española como son la inspiración en un criterio adverso a la investigación de la paternidad; la trascendencia del reconocimiento, lo mismo en el orden familiar, que en el social y económico; el respeto y protección que merecen el matrimonio y la familia legítima; y la influencia del derecho canónico que sostiene que únicamente la filiación legítima se encuentra amparada por la ley. Sin embargo, la ruta que ha proyectado el legislador y la jurisprudencia de Puerto Rico se aparta de esta interpretación restrictiva, y aplica otros factores en su enfoque de las relaciones paterno-filiales.

No obstante es preciso reconocer que las corrientes humanistas y sociológicas que inspiraron el advenimiento de la República Española señalaron un rumbo distinto, por tiempo efímero, a la interpretación del precepto legal citado, amparándose en favor de un criterio de interpretación meramente declarativa, en lugar del criterio de interpretación restrictiva que hasta entonces prevalecía, y que reapareció luego al abrogarse la Constitución de 1931.([14]) En Senten-

[14] En cuanto a la interpretación del reconocimiento mediante escrito del padre en el que conste su voluntad indubitada de reconocer por suyo al hijo, véase, Sentencia núm. 664 de 8 de diciembre de 1933 (211 Jurisp. Civil, I, pág. 399).

cia de 27 de abril de 1934 (213 Jurisp. Civil, pág. 665) se resuelve específicamente que desde la vigencia del artículo 43 de la Constitución, que permite la investigación de la paternidad—criterio que informa la jurisprudencia puertorriqueña—no es aplicable la doctrina anterior que interpreta en sentido restrictivo los preceptos del artículo 135 del Código Civil, y que la posesión de estado de hijo natural implica una cuestión de hecho que corresponde al tribunal de instancia. [15] Y en la Sentencia de 9 de mayo de 1935 (219 Jurisp. Civil pág. 37) se alude a que "la nueva doctrina (del Tribunal, *respondiendo al estado de conciencia colectiva actual*", no es de una interpretación restrictiva del artículo 135 según preconizada por la jurisprudencia tradicional. Comentando esta última sentencia en la Revista de Derecho Privado, vol. XXII, pág. 158, se dice:

"Aun sin acoger todas las conclusiones propugnadas por los partidarios del llamado método *históricoevolutivo* de interpretación de las normas jurídicas, puede admitirse hoy, como doctrina ponderada y de muy general aceptación, la de que no bastan, para realizar cumplidamente la función interpretativa, los elementos *gramaticales* y *lógicos*, pues si la ley ha de estar en contacto con las exigencias de la vida real, que constituyen su razón de ser, es preciso que los resultados que se obtengan merced a estos dos elementos clásicos sean reforzados y controlados por la aplicación del que suele llamarse elemento *sociológico*, integrado por aquella serie de factores—ideológicos, morales y económicos—que revelan y plasman las necesidades y el espíritu de la comunidad en cada momento histórico; y si bien es cierto que estos factores, aparte de que no pueden nunca autorizar al intérprete para modificar o inaplicar la norma y sí sólo para suavizarla hasta donde permita el contenido del texto que entra en juego, requieren en su utilización mucho tino y prudencia, porque envuelve grave riesgo de arbitrariedad al entregar al criterio subjetivo del juez apreciaciones tan delicadas como la de la conciencia moral de un pueblo, se ha de recono-

---

[15] Se estimaron suficientes para acreditar la posesión de estado actos de la madre y los hermanos del demandado, "asiduidad de cariño y trato revelado en actos tan elocuentes como el de enseñarle a rezar."

cer que su aplicación se hace más segura y decisiva cuando se trata no de estados de conciencia todavía nebulosos o en vías de formación, sino de tendencias o ideas que han penetrado ya en el sistema de la legislación positiva o han obtenido su reconocimiento, de manera inequívoca, en la ley suprema del Estado."

No hay la menor duda de que estas últimas sentencias reflejan adecuadamente la posición actual de este Tribunal en materia de filiación. Localmente no se justifica la norma de interpretación restrictiva ya que ha venido permitiéndose constantemente la investigación de la paternidad, *Colón* v. *Sucn. Tristani*, 44 D.P.R. 171, 178 (1932), y además nuestro derecho positivo acusa una gran preocupación por el derecho subjetivo del individuo, o sea, el que corresponde al hijo inocente que ignora las condiciones en que fue engendrado, y sobre quien se hace caer una sanción de culpas, sin su intervención. Véanse, las Leyes Núm. 229 de 12 de mayo de 1942 (Leyes, pág. 1297) (31 L.P.R.A. sec. 502); Núm. 243 de 12 de mayo de 1945 (Leyes, pág. 815); y la Núm. 17 de 20 de agosto de 1952 (Leyes (2), pág. 201) que proclama en términos inequívocos el dogma de la igualdad de los hijos ante el derecho al disponer que "Todos los hijos tienen respecto a sus padres y a los bienes relictos por éstos, los mismos derechos que corresponden a los hijos legítimos."

Por todo lo expuesto, y no habiéndose cometido ninguno de los errores apuntados, *se confirmará la sentencia recurrida dictada por el Tribunal Superior, Sala de Ponce, en 10 de marzo de 1959.*

El Juez Asociado señor Hernández Matos no intervino.

El Juez Asociado señor Pérez Pimentel concurre en el resultado.

Opinión concurrente emitida por el Juez Asociado Señor Santana Becerra.

En casos de filiación que se han resuelto desde que pasé a formar parte del Tribunal, algunos de ellos sin opinión, he venido apuntando o reservando mi criterio sobre cuáles

deban ser los pronunciamientos filiales a partir de la Constitución de 1952. A la luz de la prueba en el récord está plenamente justificada la declaración filial que hoy confirmamos, aun bajo la exigencia de los requisitos de prueba que tanto la Sala sentenciadora como el Tribunal han tomado en consideración. Pero en lo que a mi modo de pensar respecta, llegaría al mismo resultado del caso decretando la filiación aunque no hubiera prueba alguna sobre la posesión del estado de hija natural. Consecuente en mi posición anterior, apunto también mi criterio en esta ocasión, suscintamente, ya que factores de tiempo y de disposición del trabajo no permiten por el momento una expresión elaborada de los conceptos que expongo.

La demandante nació el 3 de octubre de 1928, fruto de las relaciones de la madre con Félix Rafael Saurí. Así concluyó la Sala sentenciadora como cuestión de hecho, y como conclusión de derecho expuso: "Establecido el hecho de la paternidad de Félix Rafael, los demás hechos que hemos encontrado probados *se le juntan* para dejar a su vez establecido el reconocimiento de la demandante fundado en la posesión continua del estado de hija natural suya." La sentencia declaró a la demandante "hija natural reconocida" de Félix Rafael Saurí. La demanda se interpuso en 18 de agosto de 1952 y esos pronunciamientos se hacían el 10 de marzo de 1959, ambas cosas posteriores al 25 de julio de 1952. (Énfasis señalado.)

La Carta de Derechos del Estado Libre Asociado de Puerto Rico dispone que la dignidad del ser humano es inviolable; todos los hombres son iguales ante la ley y *no podrá establecerse* discrimen alguno por motivo de raza, color, sexo, *nacimiento*, origen o condición social, ni ideas políticas o religiosas. (*) Explicada esta disposición constitucional en su contenido y alcance plenos, dice el Informe de la Comisión de la Carta de Derechos de la Convención Constituyente:

(*) Constitución, Artículo II sec. 1.

"El propósito de esta sección es fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. La igualdad ante la ley queda por encima de *accidentes* o diferencias, bien tengan su origen en la *naturaleza* o en la *cultura*. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño. En cuanto fuera menester nuestra organización legal queda *robustecida* por la presente disposición constitucional, a la vez que *obligada a ensanchar* sus disposiciones para dar *plena realización* a lo aquí dispuesto. (Énfasis adicionado.)

Más particularmente en lo que respecta al discrimen por razón de nacimiento, dijo la Comisión en su Informe:

"Se propone *eliminar* el estigma jurídico en contra de los hijos habidos fuera de matrimonio. Se coloca a todos los hijos respecto de sus padres y respecto del *orden jurídico* en igualdad de derechos. Las uniones ilícitas pueden y deben estar prohibidas y esta disposición tendrá como una de sus consecuencias el desalentarlas. Pero el fruto inocente de ellas, debe advenir al mundo libre de descalificaciones o de inferioridades jurídicas. Así lo exige el principio de la responsabilidad individual, con arreglo a la cual nadie es culpable por los actos que él mismo no realiza. Aunque la legislación actual ya cubre en casi su totalidad lo aquí dispuesto, será menester nueva legislación. A los fines de *herencias y propiedades* las modificaciones resultantes de esta sección no deberán ser retroactivas a nacimientos ocurridos antes de su vigencia." (Énfasis adicionado.)

No podrá establecerse discrimen alguno por motivo de nacimiento, reza la Constitución, fijando ["como base consustancial de todo lo que sigue el principio de la dignidad del ser humano"] la igualdad esencial de todas las personas dentro del régimen constitucional. Para mí ello significa y quiere decir que después de dicho mandato los tribunales no harán pronunciamiento alguno catalogando, distinguiendo, adjetivando o cualificando la condición de hijo, una vez adjudicado el hecho de la paternidad. Entiendo que ese mandato ha de cumplirse en toda acción filial que ya no hubiere que-

dado resuelta al regir la Constitución, sin importar su comienzo ·o cuándo hubiere ocurrido el nacimiento, ni lo que dispusieran las leyes en vigor a la fecha de ocurrir éste.

En el plano de la esencial igualdad de la persona que la declaración constitucional persigue, no concibo un estado de derecho que aplique dicha declaración constitucional en lo que al nacimiento respecta, a aquellos que nacieren después de su proclamación, implicando una reserva en cuanto a su vigencia o efectividad que no tiene en su texto ni contempla en su espíritu, y que permitiría continuar en el régimen de la desigualdad y de la indignidad del ser humano por falta de la esencial igualdad, a varias generaciones hasta que las mismas se extingan por el proceso natural de su desaparición. En este sentido significativo es lo expresado por la Comisión de la Carta de Derechos. "Se propone *eliminar*", dice, el estigma jurídico en contra de los hijos habidos fuera de matrimonio. "Se coloca a *todos* los hijos", continúa, respecto de sus padres y *respecto del orden jurídico,* en igualdad de derechos.

En el espíritu de reivindicación humana a través de la esencial igualdad de la persona en que se adoptó esa parte de nuestra Carta de Derechos, no concibo que pueda quedar en pie para la generación ya procreada un estado de derecho que, aun bajo la avanzada legislación sobre los hijos de 1942 a 1952 según ha sido interpretada, mantiene todavía lo que para mi es el contrasentido jurídico-social del padre que engendró y del hijo engendrado que lo es para un fin y que no lo será para otros, como si la naturaleza así se desdoblara. No concibo tampoco dentro del espíritu señalado, el que se contemplara dejar a la generación procreada sujeta al eventual peligro de un retroceso en la legislación de avance vigente al momento de proclamarse la Constitución lo cual, bajo el estado de derecho que apunto, sería factible siempre que no se extendiera a los que nacieren después.

Me he referido a la esencial igualdad del hijo en la persona, no en su patrimonio. La diferencia en patrimonio, la "herencia y propiedades", no crea estigma. Dentro del régimen matrimonial mismo unos hijos han recibido menor patrimonio que otros, sin que por ello no se les haya tenido en la esencial igualdad de sus personas. Y aun en lo que al patrimonio respecta, a partir de la Constitución *todos los hijos* no importa cuándo o la condición en que hayan nacido o se les haya declarado. hijos, han de advenir a la herencia en plena igualdad de derechos.(**)

Tengo la convicción que por imperativo de la declaración constitucional según me es dable entenderla, el artículo 125 del Código Civil no tiene ya razón de ser. Pronunciada la condición en sí de ser hijo se adviene a la esencial igualdad de la persona por la superior declaración constitucional. Los actos que estatuye el artículo 125, —particularmente los que hubiere de realizar el propio padre o su familia, de donde surja una posesión de estado, —que llevarían al hijo al seno de la familia y a tener un padre ante la ley y la sociedad, o que se lo frustraría de no lograr probarlos, son para mi accidentes, como dijera la Comisión de la Carta de Derechos en su Informe, por encima de los cuales queda la igualdad ante la ley. El artículo 125 me parece ya un anacronismo que cuanto antes debería ir a ocupar el sitio que le corresponde en un derecho de familia que ha pasado a ser histórico.

Por las razones que he expresado también confirmaría la sentencia, independientemente de que hubiera habido o no prueba sobre posesión del estado de hija natural; y habiéndose alegado y probado según el récord que al tiempo de la concepción los padres podían casarse, y que el padre falleció, la modificaría de paso declarando que Mercedes Berdecía es hija de Félix Rafael Saurí con derecho a heredarle o representarle según se disponía para los entonces hijos naturales reconocidos por la ley vigente al tiempo del fallecimiento.

---

(**) Véase Ley 17 de 20 de agosto de 1952.